**1248**

RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents, Norfolk and Western Railway Company, Burlington Northern Inc., Association of American Railroads, Mendocino Coast Railway, Inc., et al., Baltimore and Ohio Railroad Company, et al., Intervenors.

Nos. 78–2157, 80–1274 and 80–1295.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 23, 1981.

Decided April 9, 1982.

John O'B. Clarke, Jr., Washington, D.C., with whom William G. Mahoney, Washington, D.C., was on the brief for petitioner.

Richard T. Conway, Washington, D.C., with whom Harry J. Breithaupt, Jr., Washington, D.C., Ass'n of American Railroads, Peter J. Shudtz, Baltimore, Md., Baltimore and Ohio Railroad Co., et al., Barry McGrath and John D. Boelter, St. Paul, Minn., Burlington Northern, Inc., and Peter J. Hunter, Roanoke, Va., Norfolk and Western Ry. Co., were on the joint brief for intervenors.

Albert W. Laisy, Baltimore, Md., also entered an appearance for intervenors Baltimore and Ohio Railroad Co., et al., in No. 80–1295.

James M. Nicholson, also entered an appearance for intervenor, Mendocino Coast Ry., Inc., et al., in No. 80–1274.

John J. McCarthy, Jr., Atty., Interstate Commerce Commission, Washington, D.C., with whom Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Interstate Commerce Commission, Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III and Kenneth P. Kolson, Attys., Dept. of

Justice, Washington, D.C., were on the brief for respondents. James P. Tuite and Frederick W. Read, III, Attys. Interstate Commerce Commission, and Peter L. de la Cruz, Atty. Dept. of Justice, Washington, D.C., also entered an appearance for respondents.

Before GINSBURG, Circuit Judge, McGOWAN, Senior Circuit Judge and NICHOLS,* Associate Judge, United States Court of Claims.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

Separate statement filed by Judge NICHOLS, concurring in the result.

McGOWAN, Senior Circuit Judge:

Railway Labor Executives' Association ("RLEA")[1] challenges, in three petitions consolidated before us,[2] the Interstate Commerce Commission's interpretation of the minimum job protective conditions required by section 5(2)(f) of the Interstate Commerce Act, as amended by section 402(a) of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4R Act"), recently recodified in 49 U.S.C. § 11347 (Supp. III 1979), in rail transactions involving trackage rights or leases. Prior to the 1976 amendment, section 5(2)(f) required the Commission to impose, as a condition to its approval of any transaction involving a rail carrier or carriers, a "fair and equitable arrangement" to protect the interests of affected employees. 49 U.S.C.A. § 5(2)(f) (West 1959). When it applied this mandate in trackage rights and lease cases, the Commission typically imposed a set of protections known as the "Oklahoma" conditions. Section 5(2)(f) was amended in 1976, however, to require additionally that the arrangement be "no less protective of the interests of employees than those heretofore imposed pursuant to this subdivision [section 5(2)(f)] and those established pursuant to section 405 of the Rail Passenger Service Act (45 U.S.C. 565)." 4R Act, § 402(a), Pub.L.No. 94–210, 90 Stat. 62 (1976).[3]

In the proceedings on review, the Commission concluded that, in the ordinary

---

* Sitting by designation pursuant to 28 U.S.C. 293(a).

1. RLEA is a voluntary association of the chief executives of various labor organizations that represent railroad workers.

2. No. 78–2157 (Norfolk and Western Ry); No. 80–1274 (Mendocino Coast Ry); No. 80–1295 (Western Maryland Ry—Baltimore & Ohio RR.)

3. The following is the full text of amended section 5(2)(f); the language added by the 1976 amendment is italicized:

As a condition of its approval, under this paragraph or paragraph (3), of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order,

than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. *Such arrangement shall contain provisions no less protective of the interests of employees than those heretofore imposed pursuant to this subdivision and those established pursuant to section 565 of title 45* [section 405 of the Rail Passenger Service Act]. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees. 49 U.S.C.A. § 5(2)(f) (West Supp. 1981).

As a result of the 1978 recodification of the Interstate Commerce Act, Act of Oct. 17, 1978, Pub.L.No. 95–473, 92 Stat. 1337, section 5(2)(f) now appears as 49 U.S.C. § 11347 (Supp. III 1979). The recodification effected several minor clarifying changes in the language relevant to the issue before us; Congress intended these changes to be without substantive effect. 92 Stat. at 1466.

For purposes of simplicity, and because these petitions for review center on the 1976 amendment to section 5(2)(f), we will continue to refer to the pre-recodification language of section 5(2)(f), quoted above.

trackage rights or lease case, the Oklahoma provisions represent conditions "no less protective . . . than those heretofore imposed pursuant to [section 5(2)(f) ]," and that a set of provisions known as "Appendix C–1" represents conditions "no less protective" than those "established pursuant to section 405 of the Rail Passenger Service Act." The Commission therefore held that the Oklahoma conditions as supplemented with the applicable Appendix C–1 protections satisfy the minimum requirements of amended section 5(2)(f) in the ordinary trackage rights or lease case.

RLEA argues that the reference to conditions "heretofore imposed pursuant to [section 5(2)(f) ]" mandates a more protective set of conditions, known as the "New Orleans" conditions, which prior to the 1976 amendment constituted the section 5(2)(f) protection imposed by the Commission in cases involving mergers, consolidations, and acquisitions of control. Therefore, RLEA argues, amended section 5(2)(f) requires the Commission to impose the New Orleans conditions supplemented with the applicable Appendix C–1 provisions. We find the Commission's interpretation of the 1976 amendment persuasive. Consequently, we affirm the orders under review.

## I

The lengthy history of job protective arrangements [4] began in 1936, when railroad representatives and workers signed the Washington Job Protection Agreement ("WJPA"), which provided certain bargaining and compensation protections to em-ployees affected by any "coordination" [5] between rail carriers. The heart of the WJPA was sections 4 and 5, which required the carriers to give advance notice to all employees at least ninety days prior to the proposed coordination, and which provided that no coordination could be effective until the carrier and its employees had reached an implementing agreement providing for employee selection and assignment. Other sections of the WJPA required certain post-transaction, compensatory protections. For example, any employee displaced into a lower paying position was entitled to an equalizing allowance for up to five years after the coordination.

Protective conditions received statutory foundation when Congress, in the Transportation Act of 1940, added section 5(2)(f) to the Interstate Commerce Act directing the Commission to require a fair and equitable arrangement to protect employees affected by rail "transactions." Ch. 722, § 7, 54 Stat. 906. The "transactions" covered by the provision included mergers, consolidations, leases, acquisitions of control, and acquisitions of trackage rights. *Id.*

The Commission and the courts eventually developed a set of conditions representing the general standard of employee protection under section 5(2)(f). This set, the New Orleans conditions, [6] consisted of the protections of the WJPA, including the prior notice and implementing agreement requirements of sections 4 and 5.

The Commission, however, did not apply the New Orleans conditions in all rail trans-

---

**4.** A more detailed account of this history can be found in *New York Dock Ry v. United States*, 609 F.2d 83, 86–90 (2d Cir. 1979).

**5.** The WJPA defined a "coordination" as "joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities." WJPA, *reprinted in* Appendix C to Petitioner's Br.

**6.** New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (1952) (*New Orleans II*). The Commission's action in this case was in response to the Supreme Court's holding in *Rail-way Labor Executives' Ass'n v. United States*, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950). There the Court held that the Commission, in its decision in New Orleans Union Passenger Terminal Case, 267 I.C.C. 763 (1948) (*New Orleans I*), had erred by interpreting too narrowly the scope of the protective conditions required by section 5(2)(f). On remand, the Commission held that section 5(2)(f) required the equivalent of the protections afforded under the WJPA. As the Commission later made clear in Southern Ry—Control—Central, 331 I.C.C. 151, 154 (1967), the conditions fashioned in *New Orleans II* included the substance of sections 4 and 5 of the WJPA.

actions. Instead, it customarily imposed them in cases of mergers, consolidations, and acquisitions of control, and applied a different set, the Oklahoma conditions,[7] in trackage rights and lease cases. The central difference between the Oklahoma conditions and the New Orleans conditions is that the former do not include the equivalent of sections 4 and 5 of the WJPA. In addition, the Oklahoma conditions prescribe a maximum protective period of only four years from the Commission's order of approval; the New Orleans set allows a period of up to five years from the transaction.

Another statutory source of job protection is also relevant to the issue before us. In section 405 of the Rail Passenger Service Act of 1970, 45 U.S.C. § 565 (1976) [hereinafter referred to as section 565], Congress mandated protective arrangements for employees affected by a discontinuance of intercity rail passenger service. The Secretary of Labor in 1971 certified the Appendix C–1 arrangement as satisfying the requirements of section 565, and that certification was upheld. *Congress of Railway Unions v. Hodgson*, 326 F.Supp. 68 (D.D.C. 1971). *See* pages 1255–1256 *infra*. Appendix C–1 does not include the protections of sections 4 and 5 of the WJPA; it requires only twenty days prior notice and expressly authorizes the transaction to proceed even if no implementing agreement

has been reached. In some respects, however, Appendix C–1 provides greater posttransaction protection than the New Orleans or Oklahoma conditions. For example, the protective period is increased to six years from the date of an employee's dismissal.

These various packages of protection are relevant to the 1976 amendment to section 5(2)(f) because that amendment requires conditions "no less protective" than two sets of provisions: those "heretofore imposed" under section 5(2)(f) and those "established pursuant to" section 565. Because there is no dispute that Appendix C–1 satisfies the second phrase,[8] interpretation of the amendment turns on which set—Oklahoma or New Orleans—fulfills the mandate of the first phrase. This is the central question that the Commission faced in the proceedings on review, when it set forth the minimum level of protection required by amended section 5(2)(f) in ordinary trackage rights and lease cases.[9]

II

A.

The proceedings in *Norfolk and Western Railway* began when Norfolk and Western ("N & W") applied to the Commission for trackage rights over approximately twenty-eight miles of track owned by Burlington

---

**7.** Oklahoma Ry Co. Trustees—Abandonment, 257 I.C.C. 177 (1944). The Commission stated in one of the decisions on review that the Oklahoma conditions "were ordinarily imposed in both trackage rights and lease cases under former section 5(2) of the Interstate Commerce Act, prior to enactment on February 5, 1976, of amendments to that section." Mendocino Coast Ry—Lease and Operate—California Western RR., 360 I.C.C. 653, 661 (1980). RLEA agrees with this characterization of pre-1976 Commission practice, Petitioner's Br. at 24, and RLEA's own data support it, *id.* at 25 n.9; Deferred Appendix 258–69 (RLEA-filed chart showing types of protections imposed in Commission-approved transactions).

**8.** That Appendix C–1 is "no less protective" than the conditions imposed under section 565 was made clear in New York Dock Ry—Control—Brooklyn Eastern Dist. Terminal, 360 I.C.C. 60, 69 n.13, *aff'd, New York Dock Ry v. United States*, 609 F.2d 83, 93 (2d Cir. 1979),

and is not disputed by the parties, Petitioner's Br. at 33; Respondents' Br. at 24 & n.9.

**9.** In another proceeding, the Commission set forth the minimum section 5(2)(f) protection for rail transactions involving merger, control, consolidation, coordination, or unification. New York Dock Ry—Control—Brooklyn Eastern Dist. Terminal, 360 I.C.C. 60 (1979). The Commission held that the conditions imposed under section 5(2)(f) in such transactions were the New Orleans conditions, and that those established pursuant to section 565 were the Appendix C–1 protections. Accordingly, it held that amended section 5(2)(f) requires, in the aforementioned transactions, the New Orleans conditions as supplemented by the applicable Appendix C–1 conditions. The Second Circuit affirmed the Commission, rejecting a challenge that the Commission had overstepped its statutory authority and had fashioned too broad a protection. *New York Dock Ry v. United States*, 609 F.2d 83 (2d Cir. 1979).

Northern, Inc. N & W sought the new route in order to replace a section of deteriorated Burlington track that N & W had previously used. RLEA and one of its member organizations protested the application. A Commission review board issued an initial decision, Deferred Appendix ("App.") 23, approving the acquisition and imposing a set of protections, known as the "Oregon I" conditions,[10] consisting of the Oklahoma conditions as supplemented by the applicable portions of Appendix C–1.[11] RLEA appealed the decision to the Commission, arguing that amended section 5(2)(f) required a combination of the New Orleans and Appendix C–1 provisions.

The Commission essentially affirmed the initial decision, modifying it only to take account of the Commission's intervening fashioning of the "Oregon II" conditions.[12] *Norfolk and Western Ry—Trackage Rights—Burlington Northern, Inc.,* 354 I.C.C. 605 (1978). After unsuccessfully seeking further Commission review, RLEA filed a petition for review in this court. While that petition was pending, the Commission, *sua sponte*, reopened the *Norfolk and Western* proceeding "for the sole purpose of reconsidering appropriate labor protective conditions for imposition in this proceeding and other ordinary trackage rights cases." App. 45–46. This court, on April 2, 1979, held the review proceeding in abeyance pending the outcome of the Commission's reconsideration. On February 6, 1980, the full Commission essentially affirmed the earlier decision,[13] and RLEA once more sought review in this court.

### B.

The *Mendocino Coast Railway* proceeding began when Mendocino Coast Railway ("MCR") sought permission from the Commission to lease from another rail carrier thirty-five miles of track and equipment facilities. The proposed lease period was eighteen months, renewable for an additional four years. RLEA and another labor organization contested the application. A Commission review board approved the eighteen month lease arrangement and imposed a combination of the Oklahoma and Appendix C–1 conditions. App. 60. No appeal was taken from that decision. The railroads thereafter obtained, under basically the same conditions, Commission approval to extend the lease. App. 64. This order was appealed, but the Commission affirmed the extension under those conditions. *Mendocino Coast Ry—Lease and Operate—California Western RR.,* 354 I.C.C. 732 (1978). On the same day the Commission reopened the *Norfolk and Western* proceeding, it also reopened *Mendocino* "for the sole purpose of reconsidering appropriate labor protective conditions for imposition in this proceeding and other rail lease cases." App. 70. The full Commission issued on February 6, 1980, a decision essentially affirming the orders in both cases. *Mendocino Coast Ry—Lease and Operate—California Western RR.,* 360 I.C.C. 653 (1980). RLEA then filed this petition.

### C.

In *Western Maryland Railway* and *Baltimore & Ohio Railway ("WMR–B&O"),* two rail carriers sought Commission approval of an agreement granting each applicant

---

10. Oregon Short Line RR.—Abandonment—Goshen, 354 I.C.C. 76 (1978).

11. The Oregon I protections are "the same conditions as those imposed in Oklahoma Ry Co. Trustees—Abandonment ... as supplemented by the applicable provisions of section 405 of RPSA." Mendocino Coast Ry—Lease and Operate—California Western RR., 354 I.C.C. 732, 732 (1978).

12. Oregon Short Line RR.—Abandonment—Goshen, 354 I.C.C. 584 (1978). This modification of the first Norfolk and Western decision

did not affect the substance of the conditions imposed, which continued to consist of the Oklahoma conditions as supplemented with the relevant provisions of Appendix C–1. *See* Mendocino Coast Ry—Lease and Operate—California Western RR., 360 I.C.C. 653, 656 (1980).

13. The decision also embraced the *Mendocino Coast Railway* proceeding described below, and is reported as Mendocino Coast Ry—Lease and Operate—California Western RR., 360 I.C.C. 653 (1980).

trackage rights over the other's lines. A Commission review board approved the agreement, imposing the protective conditions set forth in the original *Norfolk and Western* order. App. 218. RLEA and one of its constituent associations appealed. The division hearing the appeal noted that the Commission had reopened the *Norfolk and Western* proceeding, and therefore held that the agreement would be conditioned on the protective provisions finally developed in *Norfolk and Western*. Before that time, the carriers were not to take any action that could adversely affect the rights of employees. App. 246.

The carriers sought administrative review of this injunctive portion of the decision. Stating that the key issue in the reopened *Norfolk and Western* proceeding was whether section 5(2)(f) required protections equivalent to sections 4 and 5 of the WJPA, the carriers argued that the outcome in *Norfolk and Western* was no longer relevant to the proposed transaction because an implementing agreement had been reached. The existence of such an agreement was disputed, however, and the Commission denied the petition. App. 250.

The carriers renewed this argument and their request four months later, and this time no labor organization contested the fact of an implementing agreement. Accordingly, the Commission viewed as moot, in the proceeding before it, the issue to be decided in the reopened *Norfolk and Western* proceeding. It therefore imposed the conditions set forth in the original *Norfolk*

*and Western* ruling. App. 252.[14] The full Commission denied the appeal from this decision, App. 255, and RLEA filed a petition for review in this court.

### D.

A brief synthesis of the foregoing should help focus the issue presented by this case. We are asked to review the Commission's determination that the Oregon II conditions, as slightly modified, represent the minimum level of protection required by amended section 5(2)(f) in the ordinary trackage rights or lease case. These conditions essentially consist of the Oklahoma conditions as supplemented by the applicable Appendix C–1 protections. RLEA argues that section 5(2)(f) requires no less than the most protective combination of the New Orleans and Appendix C–1 conditions. The differences between the two combinations fall into two general categories.

First, and most importantly, the Oklahoma conditions do not contain, as does the New Orleans set, requirements equivalent to sections 4 and 5 of the WJPA. Supplementing the New Orleans and the Oklahoma conditions with Appendix C–1 does not eliminate this difference, because Appendix C–1 requires only twenty days prior notice and allows the transaction to proceed without an implementing agreement.

Second, the New Orleans conditions in some respects furnish greater post-transaction protection than do the Oklahoma conditions. Although Appendix C–1 is also more protective in this regard than the Oklahoma

14. The petitions in *Norfolk and Western* and *Mendocino*, by contrast, challenge the conditions formulated in the final Commission decision in those cases. This difference is of no consequence, however, because the latter decision essentially affirmed the first *Norfolk and Western* ruling. Therefore, the *WMR—B&O* petition, in substance, presents the same challenge as the petitions in *Norfolk and Western* and *Mendocino*. By way of all three petitions, RLEA seeks both more pre-transaction protections and more post-transaction protections than what the Commission imposed, *see* pages 12–13 *infra*; Petitioner's Br. at 57–60, although the issue of pre-transaction conditions—sections 4 and 5 of the WJPA—has dominated the parties' arguments.

In the *WMR—B&O* proceeding, the parties reached an implementing agreement; the *WMR—B&O* petition is therefore moot with respect to the issue of pre-transaction protection. The petition tenders a live issue, however, to the extent it challenges the post-transaction implications of the Commission's ruling, and we affirm the Commission with respect to this issue.

Because the petitions in *Norfolk and Western* and *Mendocino* present no such problems of partial mootness, the effect of our decision is to affirm the Commission's ruling with respect to both pre-transaction and post-transaction protection.

set, addition of the former does not cure all the differences between the requested combinations because several of the New Orleans post-transaction protections are greater still than those in Appendix C–1.[15]

## III

Although the history of the labor protective conditions at issue here is complex, the dispute before us reduces to the narrow question of whether Congress, in amending section 5(2)(f), intended to alter well-established Commission practice with the requirement that the Commission impose the New Orleans, rather than the Oklahoma, conditions in trackage rights and lease cases. Resolving this question of law is ultimately a reviewing court's task, but we keep in mind that the interpretation of a statute by the agency entrusted with its administration is entitled to careful consideration by a reviewing court, and that the thoroughness, validity, and consistency of

the agency's reasoning are to be taken into account. *Federal Election Commission v. Democratic Senatorial Campaign Committee*, —— U.S. ——, ——, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981). Applying this standard, we find no reason to upset the Commission's well-reasoned interpretation.

That interpretation finds solid support in the language of the statute. The phrase "heretofore imposed pursuant to section [5(2)(f)]" points clearly to prior Commission practice, and RLEA's own data demonstrate that, prior to the 1976 amendment, the Commission imposed the Oklahoma, not the New Orleans, conditions in trackage rights and lease cases. *See* note 7 *supra*. RLEA argues that the phrase refers to the most protective set of conditions "heretofore imposed"—that is, the New Orleans conditions. But this reading is a strained one, and the legislative history, which is silent on Congress's intent in amending section 5(2)(f),[16] does nothing to strengthen it.

---

**15.** For example, the fringe benefits and relocation benefits of the New Orleans conditions are available for a period that is not limited, as it is in Appendix C–1, by the length of an employee's service. *See* Petitioner's Br. at 57–58; App. 108.

**16.** The substance of the amendment in question did not appear in the first version of the bill that became the 4R Act. S.Rep. No. 94–499, 94th Cong., 1st Sess. (1975) (reporting out S. 2718). The House reported an amendment replacing the text of the Senate bill, an amendment that included a provision identical in all essential respects to the final amending language of section 402(a). H.R. 10979, § 503, *reprinted in* H.R.Rep. No. 94–725, 94th Cong., 1st Sess. 18 (1975). The bill then went to conference committee twice; the second time the committee reported the version that became law.

In sum, there are three committee reports concerning versions of the bill containing a provision similar to the section 402(a) amendment. All of these, most notably the final conference report on the version containing the eventual section 402(a), are silent on the purpose of the provision. H.R.Rep. No. 94–725, 94th Cong., 1st Sess. (1975); S.Rep. No. 94–585, 94th Cong., 1st Sess. (1975) (first conference report); H.R.Rep. No. 94–768, 94th Cong., 1st Sess. (1975) (same); S.Rep. No. 94–595, 94th Cong., 2d Sess. (1976) (second conference report); H.R.Rep. No. 94–781, 94th Cong., 2d Sess. (1976) (same). None contains any suggestion that Congress meant anything other

than what the language of the amendment suggests.

In an effort to find contrary indications of congressional intent, RLEA points to scattered statements made in hearings concerning other rail legislation. Petitioner's Br. at 43–47. For example, RLEA offers the following: "H.R. 7681 provides only for protection in such cases no less than those [*sic*] established pursuant to section 5(2)(f) of the Interstate Commerce Act. The latter protection is that provided in the case of mergers and other consolidations." Railroad Revitalization: Hearings on H.R. 6351 and H.R. 7681 Before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 1st Sess. 594 (1975) (statement of C.L. Dennis, Int'l President, Brotherhood of Ry, Airline and Steamship Clerks), *quoted at* Petitioner's Br. at 45. The statements do not advance RLEA's view because, in addition to their peripheral context, they far from prove that a reference to section 5(2)(f) signifies only the protection afforded by that section in mergers and consolidations.

RLEA also puts forth an argument based on subsequently passed legislation. Its supplemental brief points out that Congress, in section 1146(a) of the Omnibus Budget Reconciliation Act of 1981, Pub.L.No. 97–35, 95 Stat. 673, amended the Regional Rail Reorganization Act of 1973 to add section 412(a), which requires "the labor protection benefits set forth in New York Dock." 45 U.S.C.A. § 769c(a) (West 1981 Supp. Pamphlet). RLEA says that this

Indeed, this silence is telling evidence against the supposed purpose to change a well-settled practice.[17]

We also reject RLEA's argument that the Commission's interpretation renders the statutory language redundant. Noting that the Commission's decision considers the Oklahoma conditions to be those "heretofore imposed" under section 5(2)(f), and that the conditions "established pursuant to" section 565—the Appendix C–1 conditions—essentially contain all the protections offered by the Oklahoma set, RLEA argues that if the Commission is correct Congress need not have referred both to conditions imposed under section 5(2)(f) and to conditions established under section 565. But RLEA ignores the fact that the Commission does not view the Oklahoma conditions as representing the section 5(2)(f) protection in all cases; in mergers and consolidations it imposes the additional protections of the New Orleans set. The Commission's interpretation creates no redundancy, therefore, because the references to section 5(2)(f) and

section 565 are both necessary to secure adequate protection in cases involving mergers and consolidations.

RLEA searches for support in *Congress of Railway Unions v. Hodgson*, 326 F.Supp. 68 (D.D.C.1971), which considered a challenge to the Secretary of Labor's certification of Appendix C–1 as satisfying the command of section 565 to provide, in cases of rail discontinuance, protections "which shall in no event provide benefits less than those established pursuant to section 5(2)(f)," 45 U.S.C. § 565 (1976). Plaintiffs in *Hodgson* argued that the Appendix C–1 conditions were deficient because they did not equal the New Orleans protections, which in plaintiffs' view were mandated by the phrase "those established pursuant to section 5(2)(f)." The district court, though concluding that the Secretary's certification was not subject to judicial review, *id.* at 75, nonetheless assumed jurisdiction and upheld the conditions.

According to RLEA's brief in the instant case, all parties and the district court in

---

specific reference to conditions more protective than what the Commission had imposed in the types of transactions subject to the amendment—transfers of Conrail Lines—reflects congressional disapproval of the Commission's earlier practice in those proceedings. Petitioner's Supplemental Br. at 7–8. Whatever the merits of this interpretation may be, it does not support an inference of a prior congressional intent to alter Commission practice in a different type of proceeding.

**17.** In a slightly different context, the Seventh Circuit also concluded that the amendment to section 5(2)(f) reflects Congress's intent to maintain the prior Commission practice of applying different levels of protection in various types of proceedings. In In re Chicago, Milwaukee, St. Paul & Pacific RR., 658 F.2d 1149 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), a case that counsel for RLEA commendably offered for our attention, Petitioner's Supplemental Br., the Seventh Circuit considered RLEA's challenge to the protective conditions imposed by a reorganization court under section 5 of the Milwaukee Railroad Restructuring Act, 45 U.S.C. § 904 (Supp. III 1979). The reorganization court had conditioned approval of an abandonment transaction upon protective conditions that concededly did not conform in all respects to the usual minimum protections applied in such cases.

RLEA argued before the Seventh Circuit that the conditions did not comply with the Milwaukee Act's requirement of a "fair arrangement at least as protective of the interests of employees as that required under [amended section 5(2)(f) ]." 45 U.S.C. § 904(a)(1) (Supp. III 1979). As in the instant case, RLEA maintained that the reference to the section 5(2)(f) protection necessarily required provisions for prior notice and an implementing agreement. The Seventh Circuit, however, held that the particular transaction at issue did not require all the usual protections, and that imposing the less complete set did not violate the Act because the Commission has historically tailored the minimum protections to fit the unique features of some transactions. 658 F.2d at 1152–53. The Court rejected RLEA's argument that the 1976 amendment to section 5(2)(f) reflected a congressional intent to disallow this historical practice. The court said:

"Congress did not intend to elevate the aspects of any single ICC ruling to a statutory minimum protection to be utilized in all transactions. If anything, the legislative history of the 1976 amendments to Section 5(2)(f) suggests Congressional ratification of and deference to past ICC practice of formulating individual protective conditions to fit the circumstances."

*Id.* at 1153.

*Hodgson* "acknowledged that [in section 565] Congress was specifically referring to the *New Orleans* conditions." Petitioner's Br. at 38. The court's decision, however, gives no indication of, and indeed is inconsistent with, such an acknowledgement.[18] Hence, *Hodgson* merely weakens RLEA's position.

Finally, the Second Circuit's decision in *New York Dock Railway v. United States*, 609 F.2d 83 (2d Cir. 1979), lends no support to RLEA's position. Although the court there upheld, as an acceptable interpretation of section 5(2)(f), a set of conditions that includes the protections of sections 4 and 5 of the WJPA, the Commission in fashioning those conditions stated: "We are concerned here with the level of labor protective conditions required by [amended section 5(2)(f)] in transactions involving rail carriers ... *with the exception of trackage rights and lease proceedings.*" *New York Dock Ry—Control—Brooklyn Eastern District Terminal*, 360 I.C.C. 60, 69 (1979) (emphasis supplied). The Second Circuit's validation of this holding does not extend it to cases expressly excepted by the Commission.

## IV

Although we agree with the Commission's interpretation of the minimum conditions required by section 5(2)(f) in cases involving trackage rights and leases, we note that particular trackage rights or lease transactions may threaten impacts requiring additional protection. The Commission's own analysis reflects its awareness of this possibility,[19] and we entrust to the Commission, in the context of individual cases, the task of determining when section 5(2)(f) may call for more than the baseline protections we now uphold.

## V

The protective conditions imposed by the Commission reflect an accurate interpretation of the 1976 amendment to section 5(2)(f). We affirm the orders on review.

*It is so ordered.*

NICHOLS, Judge, concurring:

I concur in the result. We were confronted with what was essentially a very simple issue, whether the Congress has prohibited the ICC from approving agreements among railroads creating or continuing leasehold or trackage rights (as distinguished from mergers and consolidations), unless the labor protective conditions include requirements that the carriers notify the unions of the arrangement a fixed 90-days before it is to be effective, and negotiate the employee protections, with binding arbitrations in case of an impasse, all before the arrangement is put into effect. As to this, the ICC answered no and commented 360 I.C.C. at 603:

In these circumstances we find little justification for extending a blanket imposition of provisions requiring substantially advanced preconsummation notice and finalized preconsummation negotiations with "interested" employees when possibly there are no substantial number of employees likely to be adversely affected by a trackage rights or lease transaction. Typically, most of these transactions are not opposed by carriers or members of the shipping public and their expeditious consummation would be in the public interest.

In such circumstances, such a blanket requirement could encourage the raising and necessary resolution of matters hav-

---

18. The court noted the plaintiffs' argument that in the quoted language Congress was referring to the New Orleans conditions, specifically to the protections of section 4 and 5 of the WJPA. 326 F.Supp. at 75. The court held, however, that Congress did not intend to require precisely that protection, but only some form of notice and some right of arbitration of the type contained in sections 4 and 5 of the WJPA. *Id.* at 76.

19. "Of course, this does not preclude the consideration in particular cases of greater levels of protection to ensure the employees are not adversely impacted as a result of the transaction where the need therefor has been specifically established." Mendocino Coast Ry—Lease and Operate—California Western RR., 360 I.C.C. 653, 663 (1980).

ing no material relation to the particular trackage rights or lease proceeding involved, resulting in the abuse of the labor protection process. To delay possible improvements in preexisting service accruing from trackage rights or lease transactions, because of the delayed negotiation of unrelated matters, would not be in furtherance of the public interest. Of -course, this does not preclude the consideration in particular cases of greater levels of protection to ensure the employees are not adversely impacted as a result of the transaction where the need therefor has been specifically established.

I agree. Far from the need being established, it seems quite plain in the cases ostensibly at bar that no need exists or ever did, save in one instance when the necessary negotiation in fact occurred, regardless of the absence of the provisions. I thought it an outrage to demand that this overworked court should overturn the ICC without a showing that the workers theoretically to be protected in the three cases needed or wanted these so-called protection provisions, or that even their representatives did except as showing who was boss. Our lengthy dissertation, not the product of a concrete adverse situation, will be pored over and nuggets extracted by parties having fish to fry we do not even imagine.

The intervenors, most of whom would have been amici in ordinary parlance, were the carriers involved in the three cases, many other carriers, and the Association of American Railroads. Their position superficially appeared paradoxical, in that they wanted us to affirm, and yet their brief and oral argument were harshly critical of the ICC. The explanation emerges that they think the labor protective provisions in ICC cases of all kinds have flourished like the green bay tree, only partly because of Congress, but mostly because of the fostering care of the ICC itself, and that the provisions now present a costly impediment to the adjustments to changing times that railroads, like other industries, must make. Thus they wanted us to affirm in these cases on grounds that would not tie their and our hands in future ICC cases where

they might be the appealing parties. I do not understand why they did not endow themselves with more standing by cross-appealing some parts or all of the involved labor protective provisions adverse to them, but I am an ignoramus on ICC reviews and so am in no position to criticize their decision to do what they did. Since I am but a visiting judge, whatever I say will not be much help to them, but for the sake of my own integrity, I want to add this: my concurrence in the result is meant to be without prejudice to any party to an ICC proceeding who in the future may wish to challenge other labor protective provisions than those involved herein for notice, negotiation, and arbitration.