761 F.2d 714
 119 L.R.R.M. (BNA) 2258, 245 U.S.App.D.C. 311,
102 Lab.Cas. P 11,476
 BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Missouri-Kansas-Texas Railroad Company, Denver & Rio Grande
Western Railroad Company, Union Pacific Railroad
Company, et al., Intervenors.
UNITED TRANSPORTATION UNION, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Missouri-Kansas-Texas Railroad Company, Denver & Rio Grande
Western Railroad Company, Union Pacific Railroad
Company, et al., Intervenors.
 Nos. 83-2290, 83-2317.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 4, 1984.
Decided May 3, 1985.
As Amended July 12, 1985.
 
 Petitions for Review of Orders of the Interstate Commerce commission.
 Harold A. Ross, Washington, D.C., with whom Gordon P. MacDougall, Washington, D.C., was on the brief, for petitioner in No. 83-2290.
 John O'B. Clarke, Jr., Washington, D.C., for petitioner in No. 83-2317.
 Sidney L. Strickland, Jr., Atty., I.C.C., Washington, D.C., with whom Robert S. Burk, Acting Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, I.C.C., J. Paul McGrath, Asst. Atty. Gen., and John J. Powers, III and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 John H. Caldwell and Denise M. O'Brien, Washington, D.C., and Kendall T. Sanford, Denver, Colo., were on the brief for intervenor Denver & Rio Grande Western R. Co.
 James M. Verner, Ronald B. Natalie and Joseph L. Manson, III, Washington, D.C., and Michael E. Roper, Dallas, Tex., were on the brief for intervenor Missouri-Kansas-Texas R. Co. William C. Evans, Washington, D.C., entered an appearance for that intervenor.
 James V. Dolan, Charles A. Miller, and Gregg H. Levy, Washington, D.C. and Nina K. Wuestling, St. Louis Mo., were on the brief for intervenors Union Pacific R. Co. and Missouri Pacific R. Co.
 Before WRIGHT and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the court filed by Circuit Judge WRIGHT.
 Dissenting opinion filed by Senior Circuit Judge MacKINNON.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 Two unions--the Brotherhood of Locomotive Engineers (BLE) and the United Transportation Union (UTU)--object to the Interstate Commerce Commission's interpretation of labor issues arising from ICC's approval of a railroad consolidation.
 
 
 2
 The unions claim that, when the dust settled from the consolidation, certain railroads had effectively squeezed them out of their previous role in determining the crews used on particular routes. At the time, in early 1983, the unions objected and argued that the railroads' actions violated statutory labor protections. Since the railroads responded that ICC had given them full crew selection rights in the consolidation approval, the unions appealed to ICC for an order clarifying that its general consolidation approval did not affect previous labor arrangements, including crew selection rights.
 
 
 3
 In two decisions ICC rejected the unions' arguments. It maintained that the railroads' intentions on crew selection had been clear in the consolidation as approved and that ICC's authority to exempt transactions from legal obstacles, 49 U.S.C. Sec. 11341(a) (1982), immunized these crew selection prerogatives from later attack.
 
 
 4
 The unions now petition this court to vacate those ICC decisions. Four railroads--the Denver & Rio Grande Western (D & RGW), the Missouri-Kansas-Texas (MKT), the Missouri Pacific (MP), and the Union Pacific (UP)--are intervening in support of the Commission.
 
 
 5
 Because we find that ICC made no semblance of a showing that the exemption was necessary, as required by the exemption authority section, we vacate the ICC decisions and remand the case to the Commission for proceedings consistent with this opinion.
 
 I. BACKGROUND
 A. Legal Framework
 
 6
 This case presents the intersection of two statutory mandates--ICC's exclusive authority to approve rail consolidations under the Interstate Commerce Act and the statutory protection for rail labor employees under both the Railway Labor Act and the Interstate Commerce Act. The unions argue that (1) ICC did not show a necessity for waiving the Railway Labor Act in the exercise of its Interstate Commerce Act approval authority, and (2) ICC cannot waive the Interstate Commerce Act's labor protection conditions in the exercise of that approval authority. Ultimately, we find the Railway Labor Act argument dispositive, and we vacate the ICC decisions on that basis. To fully understand the texture of this dispute, however, it is necessary to examine the Interstate Commerce Act labor protection conditions as well.
 
 
 7
 1. ICC's approval authority. Under the Interstate Commerce Act, ICC has exclusive authority to approve certain consolidations and mergers. 49 U.S.C. Sec. 11341 et seq. (1982). The Act enumerates the types of transactions to which ICC's approval authority applies, id. Sec. 11343, and the considerations that must guide ICC, id. Sec. 11344. Most significantly for this appeal, "[a] carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." Id. Sec. 11341(a). Thus ICC has the power to approve a transaction and exempt its participants from legal obstacles that would impede its fruition.
 
 
 8
 In the exercise of this authority to exempt consolidations from the constraints of applicable statutes, ICC has certain ultimate constraints on its broad authority. First, there is a necessity component to the plenary authority: the statute specifies that ICC may exempt transactions from applicable laws "as necessary" for completion of the transaction. Second, as with any agency action, ICC's exercise of its authority must comport with the requirements of reasoned decisionmaking. See generally United States v. ICC, 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970).
 
 
 9
 2. Labor protection requirements. Statutory protections for railroad employees have received considerable congressional attention. Two important statutory vehicles for the current labor protection requirements are the Railway Labor Act, 45 U.S.C. Sec. 151 et seq. (1982), and the Interstate Commerce Act's labor protection section, 49 U.S.C. Sec. 11347.
 
 
 10
 The Railway Labor Act creates a highly structured system for administering and resolving labor disputes. In passing the Railway Labor Act Congress sought, in part, "[t]o avoid any interruption to commerce * * *, to forbid any limitation upon freedom of association among employees * * *, [and] to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions[.]" 45 U.S.C. Sec. 151a. The statute specifies eleven general duties of rail carriers, id. Sec. 152. It also creates a variety of mechanisms to settle rail labor disputes--a National Railroad Adjustment Board, id. Sec. 153, a National Mediation Board, id. Secs. 154-155, and a system of arbitration, id. Secs. 157-159. The statute gives special attention to changes in rates of pay, rules, and working conditions. It provides that employers give employees the opportunity for negotiation and mediation before implementing such changes. Id. Sec. 156; see also id. Sec. 152, Seventh duty. The Railway Labor Act thus stands as an important structure for maintaining labor peace and fairness.
 
 
 11
 The Interstate Commerce Act labor protection section, 49 U.S.C. Sec. 11347, affords employees substantial protection from the effects of mergers and consolidations. Such labor protection conditions have a long history. See New York Dock Railway v. ICC, 609 F.2d 83, 86-90 (2d Cir.1979). In its current version the section provides that, in the exercise of its approval authority, "the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976 * * *." 49 U.S.C. Sec. 11347 (emphasis added).
 
 
 12
 ICC has specified the particular conditions that must be observed for this Section 11347 requirement. The conditions for protecting labor in a merger are known as New York Dock conditions, see New York Dock Railway, 360 ICC 60 (1979), aff'd sub nom. New York Dock Railway v. ICC, supra. The conditions for protecting labor in transfers of trackage rights are known as Norfolk & Western conditions, see Norfolk & Western Railway Co., 354 ICC 605 (1978), modified by Mendocino Coast Railway, Inc., 360 ICC 653, 664 (1980), aff'd sub nom. Railway Labor Executives' Ass'n v. United States, 675 F.2d 1248 (D.C.Cir.1982). These conditions include negotiation and mediation for dismissal and displacement of employees, 354 ICC at 610-611, 360 ICC at 85; dismissal and displacement compensation, 354 ICC at 611-612, 360 ICC at 86; and a system of arbitration, 354 ICC at 613, 360 ICC at 87-88. Generally, the conditions provide that "[t]he rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits * * * of railroads' employees under applicable laws and/or existing collective bargaining agreements or otherwise shall be preserved unless changed by future collective bargaining agreements or applicable statutes." 354 ICC at 610, 360 ICC at 84. ICC has thus established conditions for discharging its statutory responsibility to protect labor benefits in the midst of consolidations.
 
 
 13
 In short, ICC has authority to approve certain transactions, even to the extent of exempting the transactions from other laws. At the same time, the Railway Labor Act structures rail labor relations, and the Interstate Commerce Act's labor protection section gives rail employees a measure of protection from the effects of rail transactions.
 
 B. The Current Dispute
 
 14
 This dispute has three important stages: (1) ICC's consolidation approval in 1982; (2) the post-approval conflict over crew selection; and (3) the two ICC decisions in 1983.
 
 
 15
 1. ICC approval for the consolidation. In 1982 UP and MP applied to ICC for approval of a consolidation under ICC's exclusive authority.[1] Several railroads and several unions (including the petitioners) objected to the proposed consolidation. On October 20, 1982 ICC approved the consolidation, but it also approved the application of two railroads for "trackage rights"[2] over specified MP routes to ameliorate possible anticompetitive effects. D&RGW received trackage rights for one route (Pueblo, Colorado to Kansas City, Missouri), and MKT received trackage rights for several other routes. See Union Pacific-Control-Missouri Pacific, 366 ICC 459 (1982), affirmed in part and remanded in part sub nom. Southern Pacific Transportation Co. v. ICC, 736 F.2d 708 (D.C.Cir.1984) (per curiam), cert. denied, --- U.S. ----, 105 S.Ct. 1172, 84 L.Ed.2d 322 (1985). These are the four railroads who are intervening in support of the ICC decisions--the two who received ICC approval of their consolidation (UP and MP) and the two who received trackage rights for MP routes as conditions of that approval (D&RGW and MKT).
 
 
 16
 In their applications for trackage rights D&RGW and MKT both commented on crew selection. D & RGW specified that it could, at its option, use its own crews when it used the newly granted trackage rights, Finance Docket No. 30,000 (Sub-No. 18) (DRGW-8) (cited in ICC Decision of October 25, 1983, Joint Appendix (JA) 164); MKT specified that it would use its own crews, Finance Docket No. 30,000 (Sub-No. 25) (MKT-25) (cited in ICC Decision of October 25, 1983, JA 164).
 
 
 17
 In granting the trackage rights ICC did not mention crew selection. The Commission primarily addressed the need for the trackage rights to prevent possible anticompetitive effects from the consolidation. 366 ICC at 566-568, 572-578. Indeed, the Commission denied part of MKT's application for trackage rights because it did not agree that these trackage rights were needed to promote competition. Id. at 570-572. Notably, ICC emphasized that its general trackage rights approval was subject to the Norfolk & Western conditions that protect workers' rights in trackage rights situations. 366 ICC at 654; id. at 621-622. This statement was ICC's only reference to labor arrangements in the use of trackage rights.
 
 
 18
 2. The crew assignment controversy. After the consolidation became effective, the railroads began performing their approved trackage rights operations. D&RGW temporarily used MP crews on the MP routes, but claimed that it would soon use its own crews. Exhibit A to BLE's Petition for Clarification of ICC's October 20, 1982 decision, JA 6. MKT, meanwhile, began using its own crews. UTU's Petition for Reconsideration of ICC's denial of BLE's Petition for Clarification at 3, JA 74. The unions objected. They claimed that the unions representing MP employees had an established right to a role in crew assignment and that the railroads were changing that condition without consulting them. Both D&RGW and MKT, however, claimed that the ICC approval of their applications gave them a right to use their own crews and that ICC's exemption authority immunized this right from later legal challenge. MP's Reply to BLE's Petition for Clarification at 11, JA 24; UTU's Petition for Reconsideration at 3-4, JA 74-75.
 
 
 19
 D&RGW also made an additional argument. The Atchison, Topeka, & Santa Fe Railway Company had challenged D&RGW's temporary use of MP crews in the trackage rights as anticompetitive and impermissible. On November 24, 1982 and January 18, 1983 ICC issued decisions rejecting the challenge and upholding D&RGW's plans, including the preliminary decision to use existing MP crews. The Commission noted that D & RGW had the choice of using its own crews; the Commission did not mention any lurking labor relations issues. ICC Decision, November 24, 1982, at 3 (D&RGW brief, Appendix B); ICC Decision, January 18, 1983, at 3 (id., Appendix C). In response to the unions' challenge, D&RGW claimed that these ICC decisions settled the validity of its crew selection plans. Reply of D&RGW to BLE's Petition for Clarification, JA 9-10.
 
 
 20
 Initially, the two unions responded to the railroads' position on crew selection in different ways. The United Transportation Union threatened to strike over the crew assignment issue. MP sought an injunction preventing the threatened strike. On March 1, 1984 the District Court for the Eastern District of Missouri issued such an injunction. Missouri Pacific R. Co. v. United Transportation Union, 580 F.Supp. 1490 (E.D.Mo.1984). An appeal from that injunction is pending.
 
 
 21
 The Brotherhood of Locomotive Engineers took a different tack. On April 4, 1983 it filed a petition with the Commission and requested clarification that the consolidation approval did not alter previous labor arrangements, particularly with respect to crew selection. BLE claimed that the normal Railway Labor Act and Interstate Commerce Act labor protection conditions (Sec. 11347) should apply. BLE's Petition for Clarification, JA 2-4. After ICC rejected BLE's interpretation in a May 18, 1983 decision, UTU joined BLE in a May 31 petition requesting reconsideration. On October 25, 1983 the Commission elaborated on its earlier decision and continued to reject the unions' contentions.
 
 
 22
 3. The ICC decisions. In its May 18 decision refusing BLE's request, ICC maintained that it had already decided the issue of crew selection. The Commission claimed that it had exempted the crew selection provisions, which it had not mentioned in its decision, from all legal obstacles because those provisions were in the trackage rights applications. "Inasmuch as DRGW and MKT proposed in their applications that the operations would be performed with their own crews, our approval of the applications authorizes such operations. * * * We have broad authority to impose conditions on consolidation and our jurisdiction is plenary. Therefore, we properly authorized performance of trackage rights tenants using their own crews." ICC Decision of May 18, 1983 at 4-5, JA 36-37. ICC did not specifically address the Railway Labor Act and Section 11347 arguments. Thus in its May decision ICC implied that it had immunized the crew selection prerogatives from legal obstacles by dint of having approved the trackage applications.
 
 
 23
 In its October decision the Commission again denied the unions' request. It rejected the notion that it had to provide some basis for concluding that waiver of the Railway Labor Act was necessary to the transaction. "The terms of section 11341 immunizing an approved transaction from any other laws are self-executing and there is no need for us expressly to order or to declare that a carrier is specifically relieved from certain restraints." ICC Decision of October 25, 1983 at 7, JA 163. The Commission similarly rejected the claim that Section 11347 rights were being violated. "To the extent that existing working conditions and collective bargaining agreements conflict with a transaction which we have approved, those conditions and agreements must give way to the implementation of the transaction. The labor conditions imposed under section 11347 preserve conditions and agreements in the context of the authorized transactions." Id. at 6, JA 162. The Commission thus continued to maintain that it had immunized the crew selection from all subsequent legal obstacles, and it continued to offer no analysis of the necessity of this immunity for completion of the transaction.
 
 
 24
 The unions filed petitions to this court. They claim that ICC exceeded its authority by unjustifiably waiving the Railway Labor Act and the Interstate Commerce Act labor protection conditions.
 
 II. THRESHOLD ISSUES
 
 25
 Before reaching the statutory issues, we must consider two threshold issues: timeliness and issue preclusion.
 
 A. Timeliness
 
 26
 ICC and the four intervening railroads argue that the unions are barred because their appeal is not timely. We disagree.
 
 
 27
 The timeliness dispute turns on the interpretation to be given various Commission actions. The jurisdictional statute permits judicial review if an appeal of a final order is filed within 60 days. 28 U.S.C. Sec. 2344 (1982). The railroads and ICC contend that ICC's final order on crew selection prerogatives issued on October 20, 1982 (the decision giving general approval for the UP/MP consolidation, subject to the grant of trackage rights to D&RGW and MKT). They argue that the unions' appeals for clarification in April 1983 (resulting in the May 1983 decision) and May 1983 (resulting in the October 1983 decision) are entitled to no weight because those ICC decisions were merely procedural refusals to reopen a matter decided in the October 1982 order.
 
 
 28
 The railroads and ICC rely heavily on Nat'l Bank of Davis v. Office of Comptroller of Currency, 725 F.2d 1390 (D.C.Cir.1984) (per curiam ). In that case the court ruled that a petition for review was not timely when petitioner took no action during the statutory time period of 30 days, asked the agency to reconsider two months after the decision, and sought to invoke the court's jurisdiction by filing a petition for judicial review within 30 days after the agency denied the petition for reconsideration. The railroads and ICC argue that, similarly, in the case on appeal, the unions seek to make their petition timely by dating the time period for judicial review only from the procedural refusal to reopen a previous proceeding.
 
 
 29
 Their reliance on Davis is misplaced. As this court observed some time ago in Investment Company Institute v. Board of Gov. of FRS, 551 F.2d 1270, 1281-1282 (D.C.Cir.1977), and very recently in Eagle-Picher Industries, Inc. v. EPA, 759 F.2d 905, 912, 915 (D.C.Cir.1985) (slip op. of Edwards, J. at 13-19), time limits on review may, in exceptional circumstances, be "excused" when an issue is not ripe for review during the statutory period. As we emphasized in Eagle-Picher, petitioners generally are obliged to seek judicial determination of the ripeness of their claims during the statutory period. "In general, we will refuse to hypothesize whether, in retrospect, a claim would have been deemed ripe for review had it been brought during the statutory period, in order to save an untimely claim." 759 F.2d at 909. However, we specifically noted that "[e]xceptions occasionally may be justified in the light of changed circumstances giving rise to a new cause of action beyond the statutory period for review; compelling case precedent that makes it clear beyond doubt that the claim was not ripe during the statutory period; or clear evidence that a failure to consider a petitioner's claims would work a manifest injustice." Id.
 
 
 30
 The instant case clearly presents a situation in which the petitioners' claim ripened after the expiration of the statutory period due to changed circumstances resulting from a misleading statement of position by ICC. The petitioners had no notice of their present claim until after ICC denied their petition for clarification and reconsideration thereof. In its initial decision, the ICC specifically said that the statutory labor protection conditions would apply and, thus, it would have been premature for the unions to have claimed that the conditions were being violated. The Commission and the railroads argue that the trackage applications specifically noted that D & RGW might, and MKT would, use their own crews, and thus there was no ripeness problem. However, those applications were bounded by ICC's general pronouncement that the labor protection conditions would not be violated. As soon as it became apparent that MKT intended to use its own crews, the unions petitioned ICC for clarification of the application of the labor protection conditions. The issue did not become ripe for judicial review until the Commission had specified that crew selection was exempt from all otherwise applicable legal requirements.[3]
 
 
 31
 Nor can it be claimed that the petition should be barred because it was not filed within 60 days after the May decision. For the Commission then undertook extensive review and issued a lengthy opinion in October. If the motion for reconsideration is filed within the statutorily prescribed review period, the time limitation tolls until the agency issues its final decision on the motion for reconsideration, see Outland v. CAB, 284 F.2d 224 (D.C.Cir.1960); Davis, supra, 725 F.2d at 1391 n. 5, and it is tolled while the agency is giving full consideration to the issues presented for judicial review, see Nat'l Insulation Transportation Committee v. ICC, 683 F.2d 533, 543 n. 17 (D.C.Cir.1982).
 
 
 32
 The railroads and the Commission also claim that the petition should be barred as untimely because ICC clarified its policy on crew assignment in decisions issued on November 24, 1982 and January 18, 1983. At that time D&RGW had not exercised its option to use its own crews; the Atchison, Topeka & Santa Fe Railway was protesting its use of MP crews as anticompetitive. In its decisions ICC noted that D&RGW had the option of using its own crews. The argument that this statement should have put the unions on notice is unconvincing: nothing suggested that ICC had changed its view that the general labor protection conditions would apply in full force. The dispute is not over whether the railroads could use their own crews; it is whether they could use their own crews subject to the requirements of the labor protection conditions. Before May 1983 the Commission never suggested that D&RGW and MKT could use their own crews without observing the basic labor protection conditions. And before the railroads refused to negotiate in early 1983 the unions had no reason to appeal to the Commission for clarification. Thus the November 1982 and January 1983 decisions should not stand as a bar: although those decisions suggested that the railroads could use their own crews, ICC did not suggest that they could do so without observing the basic labor protection conditions.
 
 
 33
 Finally, pointing to the principle that parties should raise their objections in administrative proceedings, United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), the railroads and ICC claim that the unions should have raised their objection in the October 1982 proceeding. However, in the administrative proceedings the unions did argue for vigorous labor protections, 366 ICC at 621-622. As discussed, it was not until the May decision that the unions should have realized that the labor protection conditions would not be fully applicable to crew selection.
 
 B. Issue Preclusion
 
 34
 MKT raises an additional threshold objection. It claims that the crew selection issues were decided in the opinion accompanying the Missouri District Court's injunction prohibiting UTU from striking, see Missouri Pacific R. Co. v. United Transportation Union, supra, 580 F.Supp. 1490, appeal pending, and that issue preclusion prevents this court from reaching the issues. This argument is frivolous. Despite broad dicta, the District Court recognized that it had no power to consider the validity of ICC orders. See id. at 1502 ("The United States Courts of Appeals are vested with exclusive jurisdiction to determine the validity of orders of the ICC."). Thus there can be no preclusive effects on this court's review of the validity of the ICC order. See 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 4420 (1981) ("The fundamental rationale of issue preclusion dictates the clearly settled requirement that it be limited to matters that have been actually decided.").
 
 
 35
 We thus reject the threshold objections and turn to the merits of the unions' contentions.
 
 III. STATUTORY ISSUES
 
 36
 The unions raise two statutory arguments: (1) ICC offered no inkling of a justification for the view that waiving the Railway Labor Act with respect to crew assignment was necessary to effectuate the transaction, and (2) the Interstate Commerce Act labor protection conditions (49 U.S.C. Sec. 11347) may not be waived because the labor protection section specifically qualifies ICC's consolidation approval authority (49 U.S.C. Sec. 11341). We find the first argument decisive.
 
 
 37
 The unions claim that ICC has wholly failed to justify the necessity for waiving the Railway Labor Act's applicability to the crew selection issue. The Commission claims that no such justification is necessary.
 
 
 38
 Although an agency receives deference in interpreting its organic statute, the agency's authority is not unbounded. Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, ---- & n. 8, 104 S.Ct. 439, 444 & n. 8, 78 L.Ed.2d 195 (1983). In reviewing an agency's interpretation we must consider whether it is within the delegation to the agency envisioned by Congress. State of Montana v. Clark, 749 F.2d 740, 744-747 (D.C.Cir.1984). Our analysis must begin with the language of Congress. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, ----, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 
 39
 The statutory language dictates that the Commission's exemption authority applies only "as necessary" to allow transactions to occur. 49 U.S.C. Sec. 11341(a). Congress has given ICC broad powers to immunize transactions from later legal obstacles, but this delegation by Congress is explicitly qualified by a necessity component. The statute thus requires that the exemption authority operate according to necessity, not according to whim or caprice.
 
 
 40
 This statutory limit on the Commission's authority creates certain responsibilities for ICC. In exercising its waiver authority ICC must do more than shake a wand to make a law go away. It must supply a reasoned basis for that exercise of its statutory authority.[4]
 
 
 41
 This necessity component of ICC's waiver authority has not frequently arisen in the case law. In part this is because, in many of the ICC waiver authority cases, the necessity for the waiver is clear; the battle is fought over whether the waiver and transaction are in the public interest. See, e.g., United States v. ICC, supra, 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700. However, ample precedent supports the view that the Commission must supply some basis for a necessity determination before the exemption authority applies. In one line of cases the Supreme Court has assumed that ICC may waive state laws only if those state laws pose an obstacle to the transaction. See Callaway v. Benton, 336 U.S. 132, 140-141, 69 S.Ct. 435, 440-441, 93 L.Ed. 553 (1949) (waiver authority applies to "state laws interposing obstacles in the path of otherwise lawful plans of reorganization"); Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 126, 68 S.Ct. 426, 430, 92 L.Ed. 580 (1948); Texas v. United States, 292 U.S. 522, 534-535, 54 S.Ct. 819, 825, 78 L.Ed. 1402 (1934).[5] Furthermore, the Supreme Court has stressed that the words of ICC's approval authority section must be carefully scrutinized to ensure that ICC does not exceed its statutory powers, County of Marin v. United States, 356 U.S. 412, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958), and that ICC's approval authority, though broad, is ultimately reviewable as an exercise of reasoned decisionmaking. See United States v. ICC, supra; Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965); Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944).
 
 
 42
 Other courts have also emphasized that there must be a basis in the record for the conclusion that the statutory waiver is necessary to the transaction. In City of Palestine, Texas v. United States, 559 F.2d 408 (5th Cir.1977), cert. denied, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978), the Fifth Circuit provided an extensive analysis of this necessity problem. In vacating ICC's determination that it had waived certain contractual obligations the court stressed: "The ICC exceeds the scope of its authority when it voids contracts that are not germane to the success of the approved * * * transaction. In its grant of approval authority, Congress did not issue the ICC a hunting license for state laws and contracts that limit a railroad's efficiency unless those laws or contracts interfered with carrying out an approved merger." Id. at 414 (emphasis added). Similarly, in an earlier case the Fifth Circuit noted that ICC approval of a carrier's plans did not automatically remove the requirements of the Railway Labor Act and the Norris-LaGuardia Act. Texas & New Orleans R. Co. v. Bhd of Railroad Trainmen, 307 F.2d 151 (5th Cir.1962), cert. denied, 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963). See also Interstate Investors, Inc. v. Transcontinental Bus System, Inc., 310 F.Supp. 1053, 1068 (S.D.N.Y.1970) (court must determine whether waiver of antitrust laws is "necessary" to completion of transaction).[6]
 
 
 43
 With these principles in mind, the current dispute comes clearly into focus. ICC claims that the Railway Labor Act was a "law" appropriately waived in the exercise of its exclusive authority. ICC's analysis of the necessity for waiving the Railway Labor Act, however, is virtually nonexistent, both in the 1982 decision and in the 1983 decisions. In the 1982 decision ICC never offered a word about waiving the Railway Labor Act with respect to the crew assignment in the trackage rights, much less the necessity for doing so. As noted, it merely approved the trackage applications and specified that the labor protection conditions applied in full. In the 1983 decisions ICC continued to give no necessity justification for the waiver of the Railway Labor Act. It claimed that "[t]he terms of section 11341 immunizing an approved transaction from any other laws are self-executing and there is no need for us expressly to order or to declare that a carrier is specifically relieved from certain restraints." ICC Decision of October 25, 1983, JA 163. In its proceedings, then, the Commission did not give a shred of reasoning to support its view that completion of the transactions required shielding crew selection from the Railway Labor Act.[7]
 
 
 44
 ICC's complete failure to justify the necessity for waiving the Railway Labor Act respecting crew selection is especially conspicuous in light of evidence suggesting that the issue would not interfere with the trackage rights. First, the Commission specifically left the question of trackage compensation open to later negotiation between the railroads, 366 ICC at 589-590; it never suggested why the question of crew selection was somehow so much more necessary to fruition of the transaction that normal Railway Labor Act procedures could not apply to the issue of crew selection. Second, ICC noted that MKT might find it necessary to use more crews than it suggested in its application, 366 ICC at 569-570; again, the Commission never suggested why the question of crew selection was so much more necessary to fruition of the transaction. On both of these issues, then, the Commission expressed a willingness to leave subsidiary trackage issues to later determination. Finally, the Denver & Rio Grande operated for some months with existing Missouri Pacific crews, and there has been no suggestion that the trackage rights were somehow frustrated as a result.[8]
 
 
 45
 In short, ICC has given no justification for a view that waiver of the Railway Labor Act is necessary to effectuate the transactions at issue. Indeed, the evidence in the record strongly suggests the contrary conclusion. The Commission therefore exceeded its authority when it claimed to have waived the Railway Labor Act regarding crew selection.
 
 
 46
 In view of this disposition, it is unnecessary to reach the second statutory issue--whether ICC may ever waive the labor protection condition section (Sec. 11347) through the exercise of the exemption authority (Sec. 11341(a)). That issue turns on whether Section 11347 is viewed as a "law" that may be appropriately waived, or as a specific qualification on the exemption authority itself. We note only that the Commission has completely failed to show any conflict between these two sections of the Interstate Commerce Act, which we assume were meant to be read in concert rather than in conflict, and we need not comment on the unlikely event that the two sections may pose a genuine conflict in some later case.[9]
 
 
 47
 We thus vacate the 1983 orders and remand the case to the Commission. The Commission is not empowered to rely mechanically on its approval of the underlying transaction as justification for the denial of a statutory right. On remand, to exercise its exemption authority, the Commission must explain why termination of the asserted right to participate in crew selection is necessary to effectuate the pro-competitive purpose of the grant of trackage rights or some other purpose sufficiently related to the transaction. Until such a finding of necessity is made, the provisions of the Railway Labor Act and the Interstate Commerce Act remain in force.
 
 
 48
 So ordered.
 
 
 49
 MacKINNON, Senior Circuit Judge (dissenting):
 
 
 50
 This case involves the consolidation of the Union Pacific Railroad Company ("UP"), the Missouri Pacific Railroad Company ("Missouri Pacific"), and the Western Pacific Railroad Company ("WP"), thus forming one of the nation's largest railroads. In an October 20, 1982 decision, the ICC granted specified trackage rights, over two sections of the Missouri-Pacific lines, to two railroads that would be harmed by the consolidation, the Missouri-Kansas-Texas Railroad Company ("Katy") and the Denver and Rio Grande Western Railroad Company ("Rio Grande"). The Commission authorized these two railroads to use their own crews to operate their own trains while exercising such trackage rights. My colleagues rule that the Commission has failed to find that it was "necessary" to the approval of the trackage rights applications and the underlying Union Pacific-Missouri Pacific-Western Pacific consolidation to waive any applicable protective labor conditions. In my view, the majority has ignored the clear import of the record and, in a decision that pays lip service to our prescribed standard of review, substituted its judgment for that of the ICC. I therefore respectfully dissent.
 
 I.
 
 51
 The majority holds first that the claims of the petitioning unions are not barred for being untimely because the October 20, 1982 ICC decision was not final and thus did not make the issue of crew selection ripe for review. I cannot agree with the majority's analysis.
 
 
 52
 This case began on September 15, 1980, when the UP, the Missouri Pacific, and the WP filed jointly for approval to consolidate. After the application was made public, 45 Fed.Reg. 68484 (1980), various parties entered the fray either to support or oppose the application. On January 13, 1981, the Katy and the Rio Grande opposed the consolidation and filed separate applications seeking protective trackage rights and other compensatory rights they alleged were necessary in order both to ameliorate the anticompetitive harms of the proposed consolidations and to protect them from revenue losses necessary to continue essential services.
 
 
 53
 The Katy sought trackage rights to operate over Missouri Pacific's tracks between Kansas City, Kansas, and Omaha, Nebraska, a distance of approximately 200 miles. The proposed operating agreement, as submitted to the ICC for approval, specified the operating conditions for the joint trackage rights and specifically stated:
 
 
 54
 MKT [Katy], with its own employees, and at its sole cost and expense, shall operate its engines, cars and trains on and along Joint Track.
 
 
 55
 Finance Doc. No. 30,000 (Sub-No. 25) 1, Exh. No. 2 at 5 (emphasis added). The Rio Grande was harmed by the merger both at the Utah and the Pueblo, Colorado gateways. It sought joint trackage rights to operate over Missouri Pacific's tracks between Pueblo, Colorado, and Kansas City, Missouri, a distance of 619 miles. Its trackage rights application submitted for ICC approval stated:
 
 
 56
 Rio Grande may, at its option, elect to employ its own crews for the movement of its trains, locomotives and cars to points on or over the Joint Track.
 
 
 57
 Id. (Sub-No. 18), Rio Grande Proposed Agreement Sec. 6(c)(3) (emphasis added). Thus, both railroads expressly requested ICC authority to use their own crews while operating their own "trains, locomotives and cars" over joint trackage with the Missouri Pacific.
 
 
 58
 On February 20, 1981, the Katy and the Rio Grande filed verified statements with the ICC in support of their applications for joint trackage rights. These statements indicated further that if the trackage rights were granted, the railroads would use their own crews. Verified Statements of Adolf Nance and Harold Hacker, quoted in J.A. at 165. In ruling on the applications, the implicit issue for the ICC was the degree of anticompetitive harm to which the Katy and Rio Grande would be subjected and accordingly what amount of compensatory rights would be necessary to protect the liability of the applicant railroads and to guarantee that they would furnish the necessary competition to the merged railroads. The petitioning unions, the Brotherhood of Locomotive Engineers ("Engineers" or "union") and the United Transportation Union ("UTU" or "union"), participated in the ICC proceedings and submitted evidence in opposition to the joint trackage rights applications. Hearings proceeded for eleven months, ending in January, 1982. There is no indication, however, that petitioners ever contended that UP or Missouri Pacific employees had a right to participate in the crew selection decision.
 
 
 59
 On October 20, 1982, the ICC approved the consolidation of the UP, the Missouri Pacific, and the Western Pacific and made the consolidation subject to the usual labor protective conditions set forth in New York Dock Ry.--Control--Brooklyn Eastern Dist. Terminal, 360 I.C.C. 60 (1979). As part of the consolidation, while disapproving other requested compensatory conditions, the ICC specifically approved the applications of the Katy and the Rio Grande for the trackage rights described above, subject to the labor protection conditions specified in Norfolk & Western Ry. Co.--Trackage Rights--Burlington Northern, Inc., 354 I.C.C. 605 (1978), as modified by Mendocino Coast Ry., Inc.--Lease and Operate, 360 I.C.C. 653, 665 (1980). Union Pacific Corp., Pacific Rail System, Inc., and Union Pacific R.R. Co.--Control--Missouri Pacific Corp. and Missouri Pacific R.R. Co., 366 I.C.C. 459, 654 (1982). Though these labor protections were held to be applicable in general, I think it is clear that they were to be inapplicable to the crew selection issue since the crew selection provisions constituted part of the trackage rights applications approved by the final order of the Commission. Moreover, unlike other trackage rights-related requests by the Katy and Rio Grande which the Commission denied, see Majority Opinion at 724 - 725, there was no express denial of the crew selection requests. Therefore, the labor unions were on notice that the ICC had authorized the Katy and the Rio Grande to use their own crews in the operation of their own trains in the exercise of their joint trackage rights.
 
 
 60
 It was not until April 4, 1983, approximately five and one-half months after the ICC's decision approving the consolidation, that the Engineers filed a petition with the ICC seeking clarification of the October 20, 1982 decision. The ICC denied the Engineer's petition on the procedural grounds that crew selection had been an issue in the consolidation proceedings, that petitioners introduced no new evidence or arguments setting forth any issue in need of clarification, and that the issues involved had been decided in the Commission's October 20, 1982 decision. Following this denial, the UTU joined the Engineers in moving for reconsideration of the denial of the motion for clarification.
 
 
 61
 Time deadlines for requesting review of agency decisions are jurisdictional and cannot be enlarged by a reviewing court. National Resources Defense Council v. NRC, 666 F.2d 595, 602 (D.C.Cir.1981); Microwave Communications, Inc. v. FCC, 515 F.2d 385, 388-89 (D.C.Cir.1974). The Hobbs Act prescribes that judicial review must be sought within 60 days of a final order. 28 U.S.C. Sec. 2344 (1982). An action of the Commission is final on the date on which it is served, and exhaustion of further administrative remedies is not required. 49 U.S.C. Sec. 10327(i) (Supp. V 1981). The Commission's decision here was served on October 20, 1982. In this case, then, the statutory time period expired December 20, 1982. No judicial review was sought before that date.
 
 
 62
 We have also recognized that a party who had the opportunity to participate in the underlying proceedings is a party "aggrieved" under 28 U.S.C. Sec. 2344. See Simmons v. ICC, 716 F.2d 40, 42 (D.C.Cir.1983). Yet I find no indication in the record or briefs that the Engineers or the UTU ever objected to the proposed crew provisions on the grounds that labor protections would be violated by granting them. Whatever caused petitioners not to seek timely review, it was not any ambiguity in the ICC decision of October 20, 1982. Petitioners plainly slept on whatever rights that they contend they possessed.
 
 
 63
 Determined to reach the contentions raised by this petition, however, my colleagues accept the labor unions' argument that the crew selection issue was not ripe for review when the ICC served its decision. Petitioners contend that the issue was not ripe because the ICC's general pronouncement that the New York Dock and Norfolk labor protection provisions would apply somehow nullified the express statements in the applications regarding crew selection. The unions claim that they petitioned for clarification of the October 1982 decision as soon as it became apparent that the railroads intended to use their own crews, i.e., when the railroads began to file their trackage rights agreements with the ICC. Brief of BLE at 719.[1] This claim should not be accepted as extending the time to appeal. The railroads at that time were doing nothing more than exercising the rights clearly granted them by the October 20, 1982 decision. The unions had been on notice since the day the applications for trackage rights were filed on January 13, 1981, that the railroads intended to use their own crews to operate their own trains if their applications for trackage rights were approved. The ICC's October 1982 decision approved those applications and authorized the use of the applicant's own crews in the operation of their own trains.
 
 
 64
 Moreover, I find the majority's analysis particularly difficult to swallow in light of Eagle-Picher Industries, Inc. v. EPA, 759 F.2d 905 (D.C.Cir.1985) (Opinion by Edwards, J.). In Eagle-Picher this court emphasized that "[a]s a general proposition ... if there is any doubt about the ripeness of a claim, petitioners must bring their challenge in a timely fashion or risk being barred." Id. at 914. [P]etitioners who delay filing requests for review on their own assessment of when an issue is ripe for review do so at the risk of finding their claims time-barred." Id. at 909. "Consequently," this court concluded,
 
 
 65
 except where events occur or information becomes available after the statutory review period expires that essentially creates a challenge that did not previously exist [emphasis added], or where a petitioner's claim is, under our precedents, indisputably not ripe until the agency takes further action, we will be very reluctant, in order to save a later petitioner from the strictures of a timeliness requirement, to engage in a retrospective determination of whether we would have held the claim ripe had it been brought on time.
 
 
 66
 Id. at 914. Under the Eagle-Picher analysis, at best petitioners must be said to have entertained "some" doubt about the ripeness of their claims. At worst, later occurrences did not create a challenge "that did not previously exist," nor were petitioners' claims "indisputably not ripe."
 
 
 67
 By this appeal petitioners plainly attempt to convert a petition to reconsider the denial of a motion for clarification into a challenge of a final decision by the ICC that granted the Katy and the Rio Grande the right to crew their own trains over joint trackage with the Missouri Pacific. Because the motion to clarify was denied on procedural grounds, the proper inquiry is whether the Commission's decision on the motion to reconsider the denial of the motion to clarify is a decision on the merits. A decision on the merits of the motion for reconsideration could extend the time period for seeking appellate review. Bowman v. Loperena, 311 U.S. 262, 61 S.Ct. 201, 85 L.Ed. 177 (1940). The majority, however, never reaches this question.
 
 
 68
 I thus disagree with the conclusion that the October 20, 1982 decision was not ripe for review. I am also disturbed by the ostensible ease by which the panel finds jurisdiction. Apparently, this court is not "fastidious about the impropriety of reaching merits issues without first establishing jurisdiction." Beattie v. United States, 756 F.2d 91, 126 (D.C.Cir.1984) (Scalia, J., dissenting, opinion filed Feb. 26, 1985). Compare Eagle-Picher, supra, at 911 ("[p]roffered excuses for late filing are carefully scrutinized"). In my view, the very substantial delay of petitioners should not be so rewarded. My only solace lies in the hope that the majority's retrospective ripeness analysis is motivated by the fact that the present proceedings were conducted without the benefit of Eagle-Picher.
 
 II.
 
 69
 Even assuming a finding of jurisdiction in this case is correct, the majority has clearly erred in its decision on the merits. It decides that because the ICC did not make an express finding that the waiver of any labor protections applicable to the crew selection provisions in the trackage rights applications was "necessary" to approval of the transaction, it exceeded its authority under the Interstate Commerce Act, 49 U.S.C. Sec. 11341(a) (Supp. IV 1981), in excepting those provisions from any labor protections.
 
 
 70
 Why the lack of an express "necessity" finding in and of itself requires the court to vacate the ICC's approval regarding crew selection on this record is puzzling. The whole basis for granting the trackage rights, which included the crew selection provisions, was the implicit conclusion that the granting of such rights was necessary to the approval of the merger. Presumably, the majority senses a conflict between the approved crew selection provision and the unions' asserted rights. The majority, however, if it knows, does not indicate what the parameters of the unions' claimed rights might be and similarly fails to state where, if anywhere, these rights and applicable labor protections intersect. For all the majority indicates, they may not conflict at all. Indeed, this was the conclusion reached by the ICC (J.A. 163-64). Obviously, if there is no conflict, there is no need to vacate the Commission's decision on crew selection. Yet, in the absence of any evidence supporting the unions' claims, and in the face of justifications for the ICC's decision, the majority, without further inquiry, leap frogs the Commission's findings and completely nullifies the authority of the ICC to provide for crew selection in trackage rights agreements imposed to ensure that consolidations are in the public interest. The majority's reasons for doing so are inexplicable.
 
 
 71
 The arguments of the Engineers and the UTU, and the majority decision itself, are based on the fundamental assertion by the unions that they enjoy by custom and by collectively-bargained agreements a right to crew all trains passing over the Missouri Pacific's tracks. This is tantamount to a declaration that the unions, in effect, have a proprietary interest in the tracks of their employer--an astonishing contention. Also implicit in the unions' assertion is the claim that the unionized employees of the consolidated railroads (the Missouri Pacific, UP, and WP) have a colorable right to bargain with the Katy and the Rio Grande over who will crew the trains of the latter railroads. There is no basis in law or fact for such an absurd conclusion. It is basic contract law that one cannot be bound by agreements between third parties. Even assuming such rights might exist, the ICC found that "the record contains no evidence to support the contention of UTU and BLE that UP-MP employees have rights under collective bargaining agreements to participate in the crew selection process' of foreign railroads operating under trackage rights (J.A. 168).
 
 
 72
 In my opinion the court errs partly because it confuses the issue in this case. It states that "[t]he dispute is not over whether the railroads could use their own crews; [the dispute] ... is whether they could use their own crews subject to the requirements of the [statutory] labor protection conditions." Maj.Op. at 722. The ICC's October 20, 1982 decision stated that the labor protections would apply to the transaction. As previously explained, the ICC saw no apparent conflict between the protective labor conditions and its decision to permit crew selection by the railroads who operate the trains. But in its 1983 decisions, in an effort to meet the unions' scattered arguments, the Commission ruled in the alternative that the crew selection process was exempt from any labor protection conditions that might apply. In my view the issue in this case, assuming that the applicable labor provisions in the Act conflict with the proposed ICC action, is merely whether the ICC had the authority to so exempt the crew selection process from applicable labor protection conditions, and if so, whether it properly exercised that authority. In all other respects, the statutory labor protections still apply.[2]
 
 
 73
 The Interstate Commerce Act in section 11341(a) provides:
 
 
 74
 The authority of the Interstate Commerce Commission under this subchapter is exclusive.... A carrier, corporation, or person participating in that transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction....
 
 
 75
 49 U.S.C. Sec. 11341(a) (emphasis added). The authority granted the ICC under this statute is very broad. To the extent necessary to approve a transaction--the merger in this case--the ICC may exempt the carrier involved from "all other law." This is plain language, and there is nothing on which to base any contention that it does not mean exactly what it says, or that the Railway Labor Act, 45 U.S.C. Secs. 151 et seq. (1982)[3] is not a "law" subject to the exemption authority under Sec. 11341(a).
 
 
 76
 In Brotherhood of Locomotive Engineers v. Chicago & North Western Ry. ("North Western"), 314 F.2d 424 (8th Cir.), cert. denied, 375 U.S. 819 84 S.Ct. 55, 11 L.Ed.2d 53 (1963), the court held that Sec. 5(11) of the Interstate Commerce Act (now Sec. 11341(a)) conferred exclusive and plenary jurisdiction upon the ICC to approve mergers and exempt the carrier from all other restraints of federal law, including the Railway Labor Act ("RLA"). Id. at 429, 431-32. In that pre-Staggers Act case, the court affirmed the order of the ICC that approved a stipulation by the carriers that overrode the RLA. The court rejected the union's claim, which is similar to that made here, that the ICC lacked jurisdiction because it failed to find expressly that the provisions of the Railway Labor Act were rendered inoperative. Id. at 432. Rather, the court agreed with the Commission's finding, as expressed in another proceeding, that "[t]he terms of this paragraph are self-executing, and there is no need for this Commission expressly to order or declare that a carrier be relieved from certain restraints." Id. (quoting Chicago, St. Paul, Minneapolis & Omaha Ry. Lease, 295 I.C.C. 696 (1958)).
 
 
 77
 In the present case the Commission similarly noted that the provisions of Sec. 11341(a) provide "self-executing immunity on all material terms of the agreement ... to the extent necessary to ... implement[ ] the agreement" (J.A. 171) (emphasis added). Granted, North Western, supra, involved a stipulation by the carriers which required arbitration in a manner similar to that provided by the RLA. The majority, however, refuses to recognize the clear breadth of the ICC's authority expressed in North Western. Rather, it attempts to distinguish the case by noting how similar it is to the present case, see Maj. Op. at 724 n. 6, a novel technique that substantially broadens the ability to reach the result desired by the majority.[4]
 
 
 78
 The apparent ease by which the majority arrives at its conclusion is attributable in large part to its mischaracterization of Supreme Court precedent. Through the majority's misreading of these cases, it has manufactured a wholly new and more difficult ICC waiver standard. The majority claims support from "one line of cases" that assertedly permits ICC waiver "only if those state laws pose an obstacle to the transaction." Maj. Op. at 723 (emphasis added). No such "line" exists.
 
 
 79
 The principal case the majority cites for its contention, Callaway v. Benton, 336 U.S. 132, 140-41, 69 S.Ct. 435, 440-41, 93 L.Ed. 553 (1949), set forth the majority's quote in dicta. Callaway involved a railroad reorganization under Sec. 77 of the Bankruptcy Act, 11 U.S.C. Sec. 205, and under the "narrow facts" there present (336 U.S. at 150, 69 S.Ct. at 445), raised the question whether a bankruptcy court could enjoin a state court suit leading to a determination of the requirements of state law with respect to the sale of the entire assets of the lessor railroad. In its limited two paragraph discussion of Sec. 5(11) of the Interstate Commerce Act (now Sec. 11341(a)), the Court expressly rejected any reliance on that section of the Act and, furthermore, distinguished the Bankruptcy Act from the Interstate Commerce Act. Id. at 139-40, 69 S.Ct. at 440 ("[T]hat section [Sec. 5(11) ] relates to voluntary mergers, not to the purchase of a leased line as part of a plan of reorganization.") ("That power [under Sec. 77] flows from a different source than the power over consolidations under the Interstate Commerce Act."). In its only comment relevant to this case, the Court merely reiterated that nothing in its opinion should be read to derogate its prior opinions upholding the ICC's power "to override state laws interposing obstacles in the path of otherwise lawful plans of reorganization." Id. at 140-41, 69 S.Ct. at 441 (emphasis added) (footnote omitted).
 
 
 80
 The remaining cases cited by the majority similarly fail to support the proposition for which they are cited. In Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580 (1948), a South Carolina statute forbade the operation of foreign railroads in that state. The ICC approved a transaction and exempted the railroad from the strictures of the state law. The South Carolina Supreme Court held that the ICC lacked power under Sec. 5 to relieve the carrier from the state law requirements. The Court reversed, explaining:
 
 
 81
 ... Furthermore, since that case [Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402 (1934) ] was decided Congress has given additional proof of its purpose to grant adequate power to the Commission to override state laws which may interfere with efficient and economical railroad operation. By Sec. 5(11) of the Interstate Commerce Act, as amended by the Transportation Act of 1940, 54 Stat. 908, 49 U.S.C. Sec. 5(11), Congress granted the Commission "exclusive and plenary" authority in refusing or approving railroad consolidations, mergers, acquisitions, etc. The breadth of this grant of power can be understood only by reference to Sec. 5(2)(b) which authorizes the Commission to condition its approval upon "such terms and conditions and such modifications as it shall find to be just and reasonable." All of this power can be exercised in accordance with what the Commission may find to be "consistent with the public interest." The purchaser of railroad property with Commission approval is authorized by Sec. 5(11) "to own and operate any properties ... acquired through said transaction without invoking any approval under State authority," and such an approved owner, according to that paragraph, is "relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved ... and to hold, maintain, and operate any properties ... acquired through such transaction."
 
 
 82
 This language very clearly reposes power in the Commission to exempt railroads under a Sec. 5 proceeding from state laws which bar them from operating in the state or impose conditions upon such operation.
 
 
 83
 Id. at 125-26, 68 S.Ct. at 430 (emphasis added). Thus, the Court did not adopt an "obstacle" standard; rather it articulated the standard as being the "public interest" goal of the statute.
 
 
 84
 The third case cited by the majority, Texas v. United States, 292 U.S. 522 54 S.Ct. 819, 78 L.Ed. 1402 (1934), concerned the ICC's approval of a transaction that had exempted a railroad from the prescriptions of a Texas statute which required a railroad operating in the state to maintain offices there. The Commission had found that requiring the railroad in question to maintain such offices would entail "unnecessary" and "burdensome" expenditures and waived compliance therewith. Id. at 533, 54 S.Ct. at 825. In upholding the ICC the Supreme Court noted:
 
 
 85
 Title II of the Emergency Railroad Transportation Act, 1933, in amending Sec. 5 of the Interstate Commerce Act, carries its own provision as to immunity from state requirements which would stand in the way of the execution of the policy of the Congress through the Commission's orders.
 
 
 86
 ....
 
 
 87
 ... The scope of the immunity must be measured by the purpose which Congress had in view and had constitutional power to accomplish. As that purpose involved the promotion of economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure, the removal of such burdens when imposed by state requirements was an essential part of the plan....
 
 
 88
 Id. at 534, 54 S.Ct. at 825. The granting of full trackage rights here is also an essential part of the plan to permit the merger and to compensate--in the public interest--for some of its anticompetitive effects.
 
 
 89
 Finally, in what can charitably be attributed to oversight, the majority fails to mention in its line of precedent and relegates to a footnote Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305 (1948), which contradicts the majority's position by stating that the "public interest" is the controlling consideration.[5] In Schwabacher, the ICC approved, again under Sec. 5(11), the voluntary merger of three railroads. Intervening dissenting shareholders of one of the merging railroads alleged that the terms of the merger would deprive them of charter rights granted by their company's state of incorporation. The Commission, however, disclaimed jurisdiction to pass on the claims of the shareholders and stated that the railroads were free to settle such controversies "through negotiation and litigation in the courts." Id. at 188, 68 S.Ct. at 962. The Supreme Court reversed. It held that the Commission erred in renouncing its authority to determine finally the rights of the dissenting shareholders, and specifically held that
 
 
 90
 ... no rights alleged to have been granted to dissenting stockholders by state law provision concerning liquidation survive the merger agreement approved by the requisite number of stockholders and approved by the Commission as just and reasonable.
 
 
 91
 Id. at 201, 68 S.Ct at 968 (emphasis added). The Court reasoned that it would be "inconsistent to allow state law to apply a liquidation basis ... for continued public service." Id. at 200, 68 S.Ct. at 968. Regarding the waiver authority, the Court reaffirmed that " 'Congress has long made the maintenance and development of an economical and efficient railroad system a matter of primary national concern. Its legislation must be read with this purpose in mind.' " Id. at 193-94, 68 S.Ct. at 964 (quoting Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 124-25, 68 S.Ct. 426, 430, 92 L.Ed 580 (1948)). The Court noted that "[t]he tenor of all ... [its prior decisions under the Transportation Act of 1920, 41 Stat. 456] was to confirm the power and duty of the Interstate Commerce Commission, regardless of state law, to control rate and capital structures, physical make-up and relations between carriers, in the light of the public interest in an efficient national transportation system." Id. at 192, 68 S.Ct. at 963 (emphasis added). Similarly, "[t]he Transportation Act of 1940 [54 Stat. 908, 49 U.S.C. Sec. 5(11) ] ... authorized approval by the Commission of carrier-initiated, voluntary plans of merger or consolidation if, subject to such terms, conditions and modifications as the Commission might prescribe, the proposed transactions met with certain tests of public interest, justice and reasonableness, in which case they should become effective regardless of state authority." Id. at 193, 68 S.Ct. at 964 (emphasis added) (footnote omitted).[6]
 
 
 92
 In sum, not only did the Supreme Court not adopt the rigorous "obstacle" standard which the majority today requires, the Court envisioned that the legislative purpose was to grant the Commission greater authority than the majority suggests to override state laws where needed to approve transactions "consistent with the public interest" and to ensure that they are "just and reasonable." Schwabacher, 334 U.S. at 194-95, 68 S.Ct. at 965.
 
 
 93
 The majority would admonish us that the ICC's exemption authority under section 11341(a) must operate "according to necessity, not according to whim or caprice" and that in exercising this authority, "ICC must do more than shake a wand to make a law go away." Maj. Op. at 723. However, in this case it is not the ICC but the majority of the panel which relies on occult powers. For it is the majority who has made the ICC's section 11341(a) exemption authority completely disappear and who has used its opinion to obscure the basis for the ICC's decision to exempt the crew selection process from any protective labor conditions.
 
 
 94
 There is no dispute here that the approval of the Katy and Rio Grande trackage rights was "necessary" to the approval of the UP-Missouri Pacific-Western Pacific consolidation. The ICC specifically found that the trackage rights were needed to offset the anticompetitive harms created by the consolidation. 366 I.C.C. 459, 566-79. This court has affirmed this aspect of the ICC's decision. Southern Pacific Transportation v. ICC, 736 F.2d 708 (D.C.Cir.1984) (per curiam), cert. denied, --- U.S. ----, 105 S.Ct. 1172, 84 L.Ed.2d 322 (1985). But the ICC did not approve the trackage rights in the abstract; rather, it approved, pursuant to this "necessity" finding, the trackage rights as applied for by the Katy and the Rio Grande.
 
 
 95
 The ICC cannot bootstrap any exemption to its approval of transactions without justification. But this is far from such a case, since the necessity for the waiver is clear. The whole point of granting the trackage rights applications was to reduce the anticompetitive effects of the consolidation (J.A. 169). Under the ICC's decision the Katy and the Rio Grande will be handling traffic for their own accounts, not for the consolidated UP-Missouri Pacific-Western Pacific (Id. ). Thus, the trackage rights operations were meant to be conducted in competition with the merged UP-Missouri Pacific-Western Pacific operations, id., and to offset to some extent the monopolistic effects of that enormous consolidation.[7] The majority opinion gives short shrift to these essential reasons for the ICC's decision. To be sure, the Commission's goal of preservation of competition through the grant of trackage rights might well be frustrated by the prospect of requiring the railroads granted those rights to negotiate with the union representing the employees of its competitors. It is no surprise the Commission did not feel compelled to spell out specifically such a proposition.
 
 
 96
 Moreover, the majority's self-styled definition of "trackage rights," upon which the opinion depends, reduces that term to nothing more than a railroad's right only to have its traffic run over another's tracks. See Maj. Op. at 718 n. 2. The majority assumes, with no justification whatsoever, that this cannot include a railroad's right to use its own crews in operating its own trains. This bespeaks an ignorance of what trackage rights might involve and ignores the crew selection provisions that are an integral part of the applications in this case. The majority, in fact, has pulled its definition out of its magic hat. Indeed, even UTU counsel at oral argument conceded that whether a railroad's "trackage rights" include a railroad's right to use its own crews "is really a very generic term subject to subsequent specific negotiations." The sole evidence of the meaning of the trackage rights that are here involved is found in the trackage rights applications and the decisions granting them.[8] Those applications stated in express terms that the Katy and Rio Grande would exercise their trackage rights by operating their own trains with their own employees and crews. But point, the majority decides in the teeth of the specific crew provisions themselves that trackage rights in this case do not include a railroad's right to use its own crews, even though such method of operating its trains was specifically applied for and authorized by the ICC.
 
 
 97
 That the ICC specifically left open for later negotiation between the railroads such terms as trackage compensation is no reason to infer that crew selection, which was specifically covered in the trackage rights applications, was not decided. Approval of crew selection had been expressly requested in the railroad's application for trackage rights, and both applications had been approved. The ICC similarly considered it a "material term" of the trackage rights transaction (J.A. 171), a finding that the majority attempts to disregard. Whether a railroad uses its own crews to operate its own trains was not the type of "subsidiary" trackage issue the ICC left open for later negotiation. See Maj. Op. at 724 - 725. To require that the Katy and the Rio Grande submit the issue of crew selection to arbitration could frustrate the trackage rights agreement itself and could destroy one of the essential conditions upon which the ICC approved the merger.
 
 
 98
 Finally, petitioners cannot now complain that the Commission failed to make a specific finding about the necessity for the crew selection process when no party, including the petitioners, contended during the hearings that granting the pending applications of the Katy and Rio Grande would improperly override existing collective bargaining agreements (J.A. 164, 167).
 
 
 99
 The majority has thus found itself with the rather absurd result that the Katy and the Rio Grande may not, in the exercise of their trackage rights, use their own employees to operate their own trains carrying their own traffic, for their own account, until the railroads have engaged in collective bargaining under the Railway Labor Act with their employees and possibly those of competitor railroads. As one trial judge has already noted in a related proceeding involving many of the same issues as we have here, "Congress did not intend that affected employees have such power to block consolidations which are in the public interest." Missouri Pacific R.R. v. United Transportation Union, 580 F.Supp. 1490, 1505 (E.D.Mo.1984), appeal pending (8th Cir.).
 
 
 100
 In my view, the majority has vacated the ICC's crew provision based on assumptions not supported by the record. It has closed its eyes to the specific pro-competitive purpose that the ICC found would be served by the approval of the trackage rights applications in this case. In doing so, the panel has usurped the statutory authority of the ICC and has substituted its judgment for that of the ICC. I cannot join in such a curtailment of the authority that Congress has granted to the ICC under 49 U.S.C. Sec. 11341(a), and which the ICC exercised to ensure that the consolidation it approved would serve the "public interest." 366 I.C.C. at 572, 644. Since this is one of the largest mergers in the history of American railroads, the majority's failure to correctly apply the law here could lead to tremendous nationwide harm. Accordingly, I dissent.
 
 
 
 [1]
 Western Pacific Railroad Company was also involved in the consolidation, but its role is not relevant to these petitions
 
 
 [2]
 "Trackage rights" give one railroad the right to run its trains over another railroad's tracks. Indisputably, trackage rights are " 'subject to * * * specific negotiations,' " dissent at 734. They are also subject to governing statutes and to the conditions of the Commission's approval, including the imposition of general labor protection conditions
 
 
 [3]
 The dissent's extended timeliness objection rests on a single, mistaken assumption: "Though these labor protections were held to be applicable in general, * * * they were to be inapplicable to the crew selection issue since the crew selection provisions constituted part of the trackage rights applications approved by the final order of the Commission." Dissent at 727. Unfortunately, not one word of ICC's October 1982 decision suggested that its unequivocal commitment to labor protection conditions was somehow "inapplicable to the crew selection issue." From all appearances, ICC's imposition of labor protection conditions qualified its approval of the crew selection applications, rather than the reverse. Therein lies the nub of this case and the reason why petitioners' claim was, in fact, not ripe until ICC modified that earlier commitment in the proceedings at issue
 
 
 [4]
 This is not to say that the ICC must enumerate every legal obstacle that is waived in its approval. Such a requirement might undermine the approval authority's purpose of "facilitat[ing] merger and consolidation in the national transportation system," County of Marin v. United States, 356 U.S. 412, 416, 78 S.Ct. 880, 883, 2 L.Ed.2d 879 (1958), because some legal obstacles to fruition of the transaction may not be entirely foreseeable at the time of approval. But ICC's decisionmaking process, either in the approval or in a later proceeding, must reveal evidence supporting a conclusion that waiver of a particular legal obstacle is necessary to effectuate the transaction
 
 
 [5]
 Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305 (1948), also supports this analysis. As the Fifth Circuit has explained, "In Schwabacher * * * the insistence on further compensation by preferred stockholders of a merging company exceeded the compensation found just and reasonable in the ICC's approved plan of merger. In each of these [Supreme Court] cases the voided state-related provision impinged upon the effectuation of the transaction. * * * In all of the cases approving the ICC's nullifications of state law, the laws stood in the way of the approved transaction." City of Palestine, Texas v. United States, 559 F.2d 408, 414-415 (5th Cir.1977) (emphasis added), cert. denied, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978)
 
 
 [6]
 ICC relies on Bhd of Locomotive Engineers v. Chicago & Northwestern R. Co., 314 F.2d 424 (8th Cir.), cert. denied, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963), to support its position. In that case the Eighth Circuit affirmed an ICC order approving a railroad-union labor agreement and specified that the Railway Labor Act would not apply. The government claims that C&NW stands for the proposition that the immunity is automatic and requires no finding of necessity. However, C&NW fails to carry the day for several reasons. First, C&NW itself recognized that immunity attached only to obstacles that would frustrate fruition of the merger. Id. at 432. Second, C&NW distinguished, but did not disagree with, Texas & New Orleans R. Co. v. Bhd of Railroad Trainmen, 307 F.2d 151 (5th Cir.1962), cert. denied, 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963). 314 F.2d at 433. And third, C&NW was explicitly limited to its facts. Id. at 434. C&NW did say that no statement of necessity was required. Id. at 432. To the extent that C&NW may be read to say that ICC need supply no basis for the necessity determination, we find the interpretation ill-conceived and reject it
 
 
 [7]
 ICC points to its October decision statement that "[t]he approval confers self-executing immunity on all material terms of the agreement from all other law to the extent necessary to permit implementation of the agreement," ICC Decision of Oct. 25, 1983 at 15, JA 171. It then claims that this reference to "material terms" provides a sufficient basis for immunity because crew selection was a "material term" of the trackage rights transaction. However, merely stating in totally conclusory terms that something is a "material term" is inadequate to provide the basis for the conclusion that waiver is necessary to fruition of the transaction, as Sec. 11341(a) requires. We do not, as the dissent suggests, "attempt[ ] to disregard" this statement. Dissent at 735. Rather, we search in vain for the articulated, rational explanation of this purported finding that elementary principles of reasoned decisionmaking clearly demand. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)
 
 
 [8]
 The dissent's vehement protestations about the "pro-competitive purpose" of the trackage rights approval are wide of the mark. For the question is whether the issue of crew selection somehow goes to that "pro-competitive purpose." ICC has never given the faintest hint of a reasoned explanation why crew selection is so essential to that purpose that the otherwise applicable provisions of the Railway Labor Act must be waived. Indeed, as discussed above, the evidence in the record indicates otherwise
 
 
 [9]
 The unions have argued that the Railway Labor Act and Sec. 11347 rights are largely coextensive in this case, and we thus view the Railway Labor Act argument as dispositive. To the extent that there is a meaningful difference between the Railway Labor Act and Sec. 11347 protections, the unions have not argued it, and we need not address the issue. In any event, we note that our decision vacates the ICC decisions in their entirety
 
 
 [1]
 This contention imposes on the credulity of the court. The unions, if they ever looked at the applications of the Katy or the Rio Grande, and with their interest and the competency of their lawyers they must be presumed to have done so, must have known perfectly well that if trackage rights were granted the applicants intended to use their own crews
 
 
 [2]
 See Brotherhood of Maintenance of Way Employees v. ICC, 698 F.2d 315, 317 n. 6 (7th Cir.1983) ("The adoption of standard conditions, routinely imposed, often results in incorporation of superfluous provisions having no application to the particular case under consideration.")
 Because the majority did not reach the issue of whether the labor protections under 49 U.S.C. Sec. 11347 can be exempted through Sec. 11341(a)'s exemption power, I too express no view on that issue. However, it seems to me that in this case where the trackage rights applications were approved specifically to offset the anticompetitive harms of the consolidation, the unions' rights under N & W Art. I Sec. 4 exist vis a vis the consolidating railroads and not against either the Katy or the Rio Grande.
 
 
 [3]
 45 U.S.C. Sec. 152, Seventh, for example, forbids generally a carrier's change in pay, rules, or working conditions contrary to labor agreements, without resort to negotiation
 
 
 [4]
 City of Palestine, Texas v. United States, 559 F.2d 408 (5th Cir.1977), cert. denied, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978), relied on by the majority, does not support its position. In that case, the ICC was found to have exceeded its authority when it voided an agreement with the city of Palestine to maintain a certain number of employees there, which was "not germane to the success of the approved ... transaction." Id. at 414 (emphasis added). In the present case, not only does the record support the fact that the crew selection provision was important to ameliorate the anticompetitive aspects of the proposed consolidation, the Commission itself found the provision "material" to and "related to the transportation effects" of the transaction (J.A. 170, 171). Similarly, Texas & New Orleans R.R. v. Board of Railroad Trainmen, 307 F.2d 151 (5th Cir.1962), cert. denied, 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963), is not relevant to this case. That case involved the union's power to strike under the Norris-LaGuardia Act, 29 U.S.C. Secs. 101 et seq., and the court in fact stated that "section [5(11), now Sec. 11341(a),] relieves the carriers of the restraints and limitations of other laws, but it does not, on its face, relieve them from the actions of other parties, i.e., the union's economic threat of a strike." Id. at 156 (emphasis added)
 
 
 [5]
 Compare Callaway v. Benton, 336 U.S. 132, 141 n. 10, 69 S.Ct. 435, 441 n. 10, 93 L.Ed. 553 (1949) ("Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580; Schwabacher v. United States, 334 U.S. 182 [68 S.Ct. 958, 92 L.Ed. 1305]; Texas v. United States, 292 U.S. 522 [54 S.Ct. 819, 78 L.Ed. 1402].") (emphasis added), with Maj. Op. at 723
 
 
 [6]
 The majority's citation to County of Marin v. United States, 356 U.S. 412, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958) in this discussion is misleading. That case held only that the transaction involved was not within Sec. 5(2)(a) because one party in the acquisition was not a "carrier." The case had nothing to do with the scope of the Commission to approve transactions that are within the Commission's jurisdiction or with its waiver authority
 
 
 [7]
 For example, the ICC found that the UP-Missouri Pacific-WP consolidation itself, within the areas where the merged lines overlap, will reduce Missouri Pacific traffic on the Pueblo-Kansas City line by 18.7% in the years following the consummation of the merger. Granting the Rio Grande trackage rights will, as the ICC found, contribute substantially to the economic viability of the Pueblo-Kansas City line. 366 I.C.C. at 572. Moreover, the ICC found that granting the Rio Grande "independent access" to Kansas City through trackage rights would enable it to provide new competitive routes to compensate for the loss of traffic at the Utah gateway which the Rio Grande previously derived from its relations with the WP. Id. at 576. Thus, the ICC found a substantial public benefit realized by enhancing and stimulating competition in the central corridor. Id. Both the merged lines and the Rio Grande would benefit
 
 
 [8]
 Other cases have attempted to define "trackage rights." See, e.g., Chicago, Rock Island & Pacific R.R. v. Chicago, Burlington & Quincy R.R., 437 F.2d 6, 10 (7th Cir.) ("Trackage rights" are continuing or permanent easements or licenses granted by one railroad to another railroad), cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971)