808 F.2d 1570
 124 L.R.R.M. (BNA) 2308, 257 U.S.App.D.C. 289
 BROTHERHOOD OF LOCOMOTIVE ENGINEERS and United
Transportation Union, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Missouri Pacific Railroad Company and Louisville and
Nashville Railroad Company, Intervenors.
 No. 82-1944.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 2, 1983.
Decided Jan. 9, 1987.
 
 Harold A. Ross, Cleveland, Ohio, and Gordon P. MacDougall, Washington, D.C., for petitioners.
 Timm L. Abendroth, Atty., I.C.C., with whom John Broadley, General Counsel and Henri F. Rush, Associate General Counsel, I.C.C., Washington, D.C., were on the brief, for respondent I.C.C. John J. Powers, III, and Mark C. Del Bianco, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent United States of America.
 R. Lyle Key, Jr., Louisville, Ky., for intervenor Louisville and Nashville R. Co.
 Nina K. Wuestling, St. Louis, Mo., was on the brief for intervenor Missouri Pacific R. Co. Michael Thompson, St. Louis, Mo., also entered an appearance for Missouri Pacific R. Co.
 Before WALD, Chief Judge, ROBINSON, Circuit Judge, and WRIGHT, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 Presented for our review are two orders of the Interstate Commerce Commission dismissing complaints by the Brotherhood of Locomotive Engineers (the Brotherhood) and the United Transportation Union (United) against the Louisville and Nashville Railroad Company (L & N) and the Missouri Pacific Railroad Company (MoPac). These orders endeavored to resolve a controversy arising in the wake of an earlier decision of the Commission awarding L & N trackage rights over a segment of a neighboring railroad's line and authorization to construct a short connecting track to that line. The controversy had become full-blown when L & N complemented its exercise of these powers with a consolidation of some of its freight-yard operations with those of MoPac. The current contest centers on the proper interpretation of labor conditions imposed by the Commission for the protection of employees at the consolidated yard. We affirm the Commission's disposition of the dispute.
 
 I. BACKGROUND
 A. The Grant of Trackage Rights to L & N
 
 2
 L & N operated over two somewhat parallel lines between Chicago, Illinois, and the Kentucky area. Prior to 1981, L & N maintained freight classification yards[1] on each line, one at South Hammond, Indiana, and the other approximately six miles away at Yard Center near Dolton, Illinois. L & N was sole owner of South Hammond Yard and shared ownership of Yard Center with MoPac.[2]
 
 
 3
 In 1975, L & N decided to eliminate the extra expense of duplicate yard facilities by consolidating classification operations at Yard Center. To this end, it sought authority from the Commission to acquire trackage rights[3] over 5.6 miles of the Grand Trunk Western Railroad Company's line between Munster, Indiana and Thornton Junction, Illinois, and to construct a connecting track to the Grand Trunk Western line.[4]
 
 
 4
 In 1979, the Commission awarded L & N the requested trackage and construction rights.[5] The Commission noted that L & N's project would rid it of the costs attributable to the duplication of classification facilities by "consolidating two freight yards which are 6 miles apart[,] and could result in more efficient and economic operations."[6] The Commission found that the overall benefits, environmental as well as operational, of combined operations at Yard Center outweighed any adverse environmental effect on the surrounding area.[7] The Commission concluded, then, "that, subject to labor protective conditions,[8] [L & N's] applications are consistent with the public interest."[9] The Commission's order identified the N & W labor provisions[10] as the appropriate means for protecting labor interests in this transaction.[11] The Seventh Circuit reviewed and affirmed the Commission's decision.[12]
 
 
 5
 In 1980, L & N and MoPac notified their employees that South Hammond Yard and Yard Center classification operations would be merged at Yard Center.[13] Thereafter, the unions and the railroads entered into negotiations envisioning an agreement specifying the treatment to be accorded employees there. These efforts failed, however, whereupon the railroads requested the National Mediation Board to appoint an arbitrator in accordance with the N & W conditions.[14] In 1981, while arbitration was pending, L & N completed the yard consolidation and the litigation now before us commenced.
 
 
 6
 B. The Administrative Proceedings in the Present Cases
 
 
 7
 The Brotherhood first registered a protest with the Commission. Its complaint averred that the N & W conditions were transgressed by L & N's plan to transfer employees to MoPac's payroll, to require employees to relocate, and to subject employees to MoPac's collective bargaining agreements and seniority lists.[15] The Brotherhood called upon the Commission to restrain the railroads from consummating the trackage-rights and construction proposals until the alleged violations were eliminated by mutual agreement.[16]
 
 
 8
 In a second administrative proceeding subsequently initiated, United contended that the Commission's 1979 order did not authorize L & N to transfer classification operations from South Hammond Yard to Yard Center.[17] United attempts to bolster this position by citing the fact that the Commission imposed the N & W conditions in that order[18]--conditions which, in United's view, are inapposite to yard consolidations.[19] United further argued to the Commission that the labor provisions applicable to such consolidations are the more protective "New York Dock"[20] or "Washington Job Agreement"[21] conditions, and that accordingly the notice given employees of the intended transfer of operations and the transfer itself were invalid.[22]
 
 
 9
 In response to the unions' complaints, both L & N and MoPac claimed that the Commission's 1979 order permitted a relocation of employees as part of the project.[23] The railroads further contended that employees had not been hurt by the consolidation of operations,[24] and that the relief sought by the unions would not be appropriate because the arbitral procedures set forth in the N & W conditions were then being pursued.[25]
 
 
 10
 The Commission dismissed the unions' complaints in two separate orders.[26] It found that the yard consolidation was a part of the arrangement it had approved in 1979,[27] that the N & W conditions applied,[28] and that the unions had not demonstrated any resulting harm to employees that could not be later remediated.[29] Particularly since the Commission had decided in 1979 to allow expeditious achievement of L & N's goals, it deemed an interruption of the process an undue intrusion on L & N's operations and thus a step contrary to the public interest.[30] The Commission pointed out that trackage-rights acquisitions can involve employee reassignments and maintained that the N & W conditions establish arbitration as the exclusive means of resolving disputes in connection therewith.[31] The unions then came to this court for review of those orders.
 
 
 11
 II. THE CONSOLIDATION OF YARDS AND THE APPROPRIATE
 
 PROTECTIVE CONDITIONS
 
 12
 The unions contend that the Commission's 1979 decision in L & N Trackage Rights[32] did not empower the railroads to transfer South Hammond Yard freight classification operations to Yard Center. The unions refer us to the language of the order culminating that litigation, which specifically awarded L & N trackage rights over a 5.6-mile segment of Grand Trunk Western Railroad's mainline between Munster and Thornton Junction, and authorized L & N to construct and utilize a connecting track at Munster,[33] without express mention of any yard consolidation. On the premise that the N & W conditions are not suitable for such consolidations,[34] United adds that the order's imposition of those conditions is further indication that the Commission did not sanction the amalgamation of classification operations at Yard Center.
 
 
 13
 This reading of the order completely ignores a number of features conspicuous in and fundamental to the Commission's 1979 action. The unmistakable purpose of L & N's quest for trackage and construction rights was to enable it to eliminate the costly duplicate facilities at South Hammond Yard by merging that facility's operations into those at Yard Center. Upon receipt of L & N's trackage rights and construction applications, the Commission notified interested parties that "[t]hese proposals would allow L & N's planned elimination of its South Hammond, Ind., marshalling yard and consolidation of classification activities at Yard Center, Ill."[35] The Commission's environmental impact statement repeated that announcement,[36] and proceeded to examine the environmental consequences of permitting that consolidation.[37] In its decision granting L & N's applications, the Commission declared that "the proposal will allow L & N to consolidate switching facilities at Yard Center,"[38] and devoted the bulk of its discussion to the environmental issue posed by consolidation.[39] We cannot understand how there could be any doubt as to the inclusion of consolidation of yard operations within the compass of the Commission's deliberations and decision.
 
 
 14
 Nor does the Commission's imposition of the N & W conditions, instead of the New York Dock conditions, support the extrapolation United attempts. Nowhere did the Commission suggest that it made this choice because it did not intend to approve the consolidation of yard activities; indeed, the Commission's explicit language hardly leaves room for a contrary inference.[40] Nor can we accept the unions' argument that the N & W conditions were inappropriate in the situation at hand.[41] The Commission's statutory responsibility, upon approval of L & N's requests, was "to provide a fair arrangement for employees who are affected by the transaction,"[42] and we have heretofore held that ordinarily the N & W conditions do that well enough in trackage-rights cases.[43] While we recognized that a particular grant of trackage rights might so threaten employees as to demand greater protection,[44] we left identification of such instances to the Commission's discretion,[45] and the unions are not in position to claim an unwarranted exercise of discretion here. In their respective complaints to the Commission, the unions concentrated their attack on the asserted lack of authorization to consolidate classification operations at Yard Center[46] and on alleged violations of the N & W conditions;[47] they did not insist that the exigencies of the consolidation required a heightened degree of employee protection. It is not incumbent upon us to consider whether the Commission abused discretion which it was never pressed to invoke.[48]
 
 III. THE EFFECTS OF THE N & W CONDITIONS
 
 15
 The Brotherhood characterizes as unlawful several consequences of the merger of L & N's South Hammond Yard operations with operations at Yard Center. L & N employees at South Hammond Yard were transferred to MoPac's employ at Yard Center. L & N's seniority rosters for the transferred employees were integrated into the seniority rosters for MoPac employees there. Collective bargaining agreements secured by the transferred employees at South Hammond Yard, as well as protective conditions derived from a prior merger with another railroad, the Brotherhood claims, were abrogated along the way. The Brotherhood charges that these activities violated both the N & W conditions[49] and the Interstate Commerce Act.[50] The Brotherhood argues that the yard consolidation should not have been permitted to go forward until L & N and the unions reached an agreement on these subjects, and that the Commission itself should have composed their differences instead of remitting them to arbitration. We cannot accept these claims.
 
 
 16
 The statute requiring imposition of labor protective conditions upon Commission authorization of designated transactions also prohibits any resultant worsening of the position of affected employees for a period of up to four years.[51] Consonantly, the N & W conditions expressly preserve all employee rights and benefits under applicable laws and existing collective bargaining agreements until changed by new statutes or future agreements.[52] Since a trackage-rights transaction may involve reassignment or even dismissal of some employees,[53] the N & W conditions address these consequences and assure that employees facing them will receive their statutory due. Retained employees are guaranteed the rates of pay, rules, working conditions, pensions and all other rights inuring under applicable statutes, collective bargaining agreements, job-security conditions and other protective arrangements.[54] These employees also become entitled to moving expenses[55] and reimbursement for losses from sales or other dispositions of their homes[56] when they are required to change their places of residence because of changes in the site of their employment.[57] Displaced[58] and dismissed[59] employees are granted monthly allowances[60] that many continue for as much as six years,[61] and to fringe benefits for as long as retained and furloughed employees receive them.[62] In conferring this panoply of benefits, we have held, the N & W conditions satisfy the statutory mandates of fair protection and adequate safeguards for employees in the situations to which those conditions apply.[63]
 
 
 17
 As the Commission acknowledged, the consolidation of freight-classification operations at Yard Center may have produced dislocations of the kind alleged by the Brotherhood.[64] It does not follow, however, either that the underlying transaction must be stymied until an implementing agreement between the railroads and their unions can be reached, or that the Commission itself must adjudicate issues upon which the parties cannot come to terms. The N & W provisions specify that either the railroad or the union may request and compel negotiations seeking an agreement respecting the applicability of those provisions to the transaction proposed,[65] and that, should the negotiations fail, either party may submit the dispute for adjustment by a referee,[66] whose decision will "be final, binding, and conclusive."[67] With only narrow exceptions, the N & W conditions require arbitration by a committee of "any dispute" regarding "the interpretation, application or enforcement of any provision of" those conditions,[68] and likewise make the arbitral decision "final, binding, and conclusive."[69] Equally importantly, the N & W conditions expressly authorize consummation of the underlying transaction pending negotiations and arbitration, subject to an obligation on the railroad to thereafter make employees whole.[70]
 
 IV. CONCLUSION
 
 18
 These considerations the Commission fully recognized. Indeed, they formed the core of the Commission's decisions in favor of the railroads. The Commission properly viewed the N & W conditions as the framework within which the unions' grievances were to be examined and any redress measured,[71] and the N & W arbitration procedures as the methodology by which disputes over the interpretation and application of the N & W conditions were to be analyzed and resolved.[72] And the Commission correctly concluded that the railroads need not delay consummation of the yardconsolidation proposal pending the completion of the arbitral process.[73]
 
 
 19
 In these circumstances, the Commission perceived no basis for affording relief to the unions, and consequently dismissed their complaints.[74] For the reasons we have explained, we find no fault in these dispositions.[75] The orders under review are accordingly
 
 
 20
 Affirmed.
 
 
 
 [1]
 At classifications yards, railroads engage in switching operations to add or separate cars to or from trains, in order to make up trains or change their composition
 
 
 [2]
 See Brief for Respondent Interstate Commerce Commission at 7; Louisville & N.R.R., 334 I.C.C. 273 (1968) (L & N's purchase of Chicago & E.I. Railroad Company); Louisville & N.R.R., 338 I.C.C. 134 (1970) (merger with Monon Railroad)
 
 
 [3]
 See 49 U.S.C. Sec. 11343(a)(6) (1982). Trackage rights are in the nature of licenses permitting one carrier to operate over the right-of-way of another. See Chicago, R.I. & P.R.R. v. Chicago, B. & Q.R.R., 437 F.2d 6, 10 (7th Cir.), cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971)
 
 
 [4]
 See 49 U.S.C. Sec. 10901 (1982)
 
 
 [5]
 Louisville & N.R.R., 360 I.C.C. 115 (1979), aff'd mem. sub nom. Illinois v. ICC, 622 F.2d 591 (7th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 128 (1980) [hereafter cited as L & N Trackage Rights ]
 
 
 [6]
 Id. at 118 (footnotes omitted)
 
 
 [7]
 Id. at 119
 
 
 [8]
 The Commission is statutorily required, upon approval of activity of this type, to designate a fair arrangement for the protection of employees. 49 U.S.C. Sec. 11347 (Supp. III 1985). For discussions of the history of labor protective conditions under the interstate commerce laws, see Brotherhood of Locomotive Eng'rs v. ICC, 245 U.S.App.D.C. 311, 313-314, 761 F.2d 714, 716-718 (1985), cert. granted, --- U.S. ----, 106 S.Ct. 1457, 89 L.Ed.2d 714 (1986); Railway Labor Executives' Ass'n v. United States, 219 U.S.App.D.C. 23, 25-26, 675 F.2d 1248, 1250-1251 (1982); New York Dock Ry. v. United States, 609 F.2d 83, 86-90 (2d Cir.1979)
 
 
 [9]
 L & N Trackage Rights, supra note 5, 360 I.C.C. at 120
 
 
 [10]
 See Norfolk & W. Ry., 354 I.C.C. 605, 610 (1978), as modified by Mendocino Coast Ry., 360 I.C.C. 653 (1980), aff'd sub nom. Railway Labor Executives' Ass'n v. United States, 219 U.S.App.D.C. 23, 675 F.2d 1248 (1982). The conditions, which appear as an appendix to Norfolk & W. Ry., supra, 354 I.C.C. at 610, will hereinafter be referred to as the N & W conditions. See also Railway Labor Executives' Ass'n v. United States, supra note 8, 219 U.S.App.D.C. at 29, 675 F.2d at 1254 (holding N & W conditions consistent with statutory requirements)
 
 
 [11]
 L & N Trackage Rights, supra note 5, 360 I.C.C. at 122
 
 
 [12]
 Illinois v. ICC, supra note 5
 
 
 [13]
 The notice is reproduced in the Joint Appendix (J.App.) 16-18. This notice was required by art. I, Sec. 4 of the N & W conditions. See Norfolk & W. Ry., supra note 10, 354 I.C.C. at 610
 
 
 [14]
 See Norfolk & W. Ry., supra note 10, 354 I.C.C. at 610-611
 
 
 [15]
 Complaint of Brotherhood of Locomotive Engineers p 17, Brotherhood of Locomotive Eng'rs v. Louisville & N.R.R., Fin. No. 29733 (I.C.C.) (served Sept. 18, 1981) [hereinafter cited as Brotherhood Complaint], J.App. 11
 
 
 [16]
 Id. at 13-14 (prayers for relief), J.App. 13-14
 
 
 [17]
 Complaint of United Transportation Union Sec. IV, United Transp. Union v. Louisville & N.R.R., Fin. No. 29786 (I.C.C.) (served Dec. 3, 1981) [hereinafter cited as United Complaint], J.App. 151-152
 
 
 [18]
 See notes 10-11 supra and accompanying text
 
 
 [19]
 Brief for United Transportation Union at 19. This point was not made before the Commission. See text infra at notes 46-48
 
 
 [20]
 In New Orleans Union Passenger Terminal, 282 I.C.C. 271 (1952), the Commission formulated what became known as the "New Orleans " conditions. These were superseded in 1979 by the "New York Dock " conditions, which apply corporate mergers, consolidations and acquisition of control. See New York Dock Ry., 360 I.C.C. 60, 84, aff'd, 609 F.2d 83 (2d Cir.1979). The New York Dock conditions differ from the N & W conditions in that they call for a longer notice period before the effective date of the transaction, and forbid consummation thereof until the railroad and its employees reach agreement on employee selection and assignment. The reason for the difference in the levels of employee protection is the Commission's belief that since transactions other than corporate mergers, consolidations and acquisitions of control--for example, trackage rights and leases--are less disruptive and have less significant impact on employee rights, the public interest is better served by postponing vindication for ultimately victorious employees than by delaying improvements and efficiencies in rail service. Mendocino Coast Ry., supra note 10, 360 I.C.C. at 662-663; see note 43 infra
 
 
 [21]
 The Washington Job Protection Agreement is reproduced in Chesapeake & O. Ry. v. United States, 187 U.S.App.D.C. 241, 257-263, 571 F.2d 1190, 1206-1212 (1977)
 
 
 [22]
 United Complaint, supra note 17, Sec. VIII, J.App. 153
 
 
 [23]
 Answer of Louisville & Nashville Railroad Company Sec. IV, United Transp. Union v. Louisville & N.R.R., Fin. No. 29786 (I.C.C.) (served Dec. 22, 1981) [hereinafter cited as L & N Answer to United], J.App. 176-177; Answer of Missouri Pacific Railroad Company Sec. IV, United Transp. Union v. Louisville & N.R.R., Fin. No. 29786 (I.C.C.) (filed Dec. 11, 1981) [hereinafter cited as MoPac Answer to United], J.App. 169
 
 
 [24]
 MoPac Answer to United, supra note 23, Sec. VI, J.App. 170; L & N Answer to United, supra note 23, Sec. VI, J.App. 178; Answer of Louisville & Nashville Railroad Company at 6 (conclusion), Brotherhood of Locomotive Eng'rs v. Louisville & N.R.R., Fin. No. 29733 (I.C.C.) (filed Oct. 7, 1981) [hereinafter referred to as L & N Answer to Brotherhood], J.App. 26; Answer of Missouri Pacific Railroad Company p 20, Brotherhood of Locomotive Eng'rs v. Louisville & N.R.R., Fin. No. 29733 (filed Oct. 6, 1981) [hereinafter cited as MoPac Answer to Brotherhood], J.App. 40
 
 
 [25]
 L & N Answer to Brotherhood, supra note 24, at 7 (conclusion), J.App. 27; MoPac Answer to Brotherhood, supra note 24, p 7, J.App. 40
 
 
 [26]
 Brotherhood of Locomotive Eng'rs v. Louisville & N.R.R., Fin. No. 29733 (I.C.C. Jan. 4, 1982) (decision and order) [hereinafter cited as Brotherhood I ], J.App. 107; Brotherhood of Locomotive Eng'rs v. ICC, Fin. No. 29733 (I.C.C. June 10, 1982) (decision and order) [hereinafter cited as Brotherhood II ], J.App. 142
 
 
 [27]
 Brotherhood II, supra note 26, at 2, J.App. 143 ("[t]he Commission permitted L & N ... to combine switching activities at ... Yard Center"); id. at 4, J.App. 145 ("[i]n L & N Trackage Rights, we discussed the benefits resulting from the proposal including more efficient and economic operations as well as combining freight yards"); id. at 4 n. 2, J.App. 145 ("[t]he Commission at pages 116 and 118 of L & N Trackage Rights recognized the combining of operations at Yard Center, and its results")
 
 
 [28]
 Brotherhood II, supra note 26, at 5, J.App. 146 ("[t]he combining of switching and classification operations at Yard Center is not a 'consolidation' within the meaning of 49 U.S.C. [Sec.] 11343, and did not require a different level of employee protection. These are only operational changes and not the type of 'railroad consolidations' contemplated by the statute") (citation omitted)
 
 
 [29]
 Brotherhood I, supra note 26, at 4, J.App. 110 ("the kinds of employee impacts described are capable of being remedied through monetary compensation or adjustment of seniority lists")
 
 
 [30]
 Brotherhood I, supra note 26, at 4, J.App. 110
 
 
 [31]
 The Commission made this clear in both of its decisions. In the first it stated:
 We recognize that employees may be dismissed or reassigned as a consequence of a trackage rights transaction. The very kinds of employee impacts described in this proceeding were considered in the N & W conditions. Where the railroads and employee representatives are unable to reach an accord on these matters the conditions provide for arbitration procedures. The conditions also provide that the railroads may consummate a transaction ... prior to the time that an implementation agreement is reached through arbitration, provided that, adversely affected employees are ultimately made whole.
 Brotherhood I, supra note 26, at 3, J.App. 109. In its second decision, the Commission said:
 The complaints here, including transfer of L & N employees to MoPac, merging of seniority lists, and application of MoPac's collective bargaining agreement to all employees, may have resulted from the transaction in L & N Trackage Rights, and thus fall within the scope of the N & W conditions. Under these conditions, a railroad, after notice to its employees, can consummate a transaction before the parties negotiate an implementing agreement or reach one through arbitration. However, adversely affected employees are required to be made whole. The arbitration procedure comports with Federal policy favoring arbitration for settling labor disputes. Because the N & W conditions specifically prescribe arbitration in lieu of a Commission proceeding as the remedy for employee complaints, the Commission no longer has authority to involve itself in a dispute arising out of the protective conditions.
 Brotherhood II, supra note 26, at 5-6, J.App. 146-147 (citation omitted).
 
 
 [32]
 Supra note 5
 
 
 [33]
 360 I.C.C. at 122
 
 
 [34]
 See text supra at notes 17-21. But see notes 41-48 infra and accompanying text
 
 
 [35]
 Notice to the Parties, Louisville & N.R.R., Fin. No. 27972 (I.C.C.) (filed Dec. 16, 1977), Appendix to Brief for United Transportation Union (U.App.) at 1a
 
 
 [36]
 Final Environmental Impact Statement, Louisville & N.R.R., Fin. No. 27972 (I.C.C.) (filed Feb. 3, 1978), U.App. at 3a
 
 
 [37]
 Id., U.App. at 3a
 
 
 [38]
 L & N Trackage Rights, supra note 5, 360 I.C.C. at 115; see also id. at 118 n. 8
 
 
 [39]
 Id. at 118-120
 
 
 [40]
 See note 35 supra and accompanying text
 
 
 [41]
 We are mindful that L & N Trackage Rights, in which the Commission selected the N & W conditions for the L & N-MoPac yard consolidation, won judicial approval, see text supra at note 12, and may have long since become preclusive on that point. That is a matter we need not address since we may rest our decision on other grounds
 
 
 [42]
 The full text of the statute is as follows:
 When a rail carrier is involved in a transaction for which approval is sought under [49 U.S.C. Secs. 11344, 11345 or 11346], the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565). Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action become effective, for that lesser period).
 49 U.S.C. Sec. 11347 (Supp. III 1985).
 
 
 [43]
 Brotherhood of Locomotive Eng'rs v. ICC, supra note 8, 245 U.S.App.D.C. at 315, 761 F.2d at 718; Railway Labor Executives' Ass'n v. United States, supra note 8, 219 U.S.App.D.C. at 31, 675 F.2d at 1256; see also New York Dock Ry. v. United States, supra note 8, 609 F.2d at 101
 
 
 [44]
 Railway Labor Executives' Ass'n v. United States, supra note 8, 219 U.S.App.D.C. at 31, 675 F.2d at 1256. In contrast, a higher grade of protection follows automatically in certain kinds of cases. When Commission approval is sought for acquisition of trackage rights in conjunction with a "consolidation or merger of ... properties or franchises," see 49 U.S.C. Sec. 11343(a)(1) (1982), the Commission affords the maximum employee protection by imposing the New York Dock conditions instead of the N & W conditions traditionally applied to trackage-rights awards. See note 43 supra. It is clear, however, that L & N's planned consolidation of its own operations at South Hammond Yard with those at another facility owned jointly with another railroad is not a transaction intercepted by the statute. Section 11343(a)(1) speaks to "consolidation or merger of the properties or franchises of at least 2 carriers into one corporation for the ownership, management, and operation of the previously separately owned properties," and nothing of that magnitude was envisioned here. Rather, as the Commission pointed out, L & N's proposal involved "only operational changes and not the type of 'railroad consolidations' contemplated by the statute." Brotherhood II, supra note 26, at 5, J.App. 146
 The Brotherhood says, however, that the yard consolidation was a "coordination" within the meaning of the Washington Job Protective Agreement of 1936, supra note 21, which by Sec. 2(a) is defined as "joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through separate facilities." Brief for Brotherhood of Locomotive Engineers at 20. It would suffice that the Brotherhood did not make this claim in its complaint to the Commission. See note 48 infra and accompanying text. Moreover, as we later discuss, the question whether that or any other agreement was infringed by L & N's transfer of classification operations to Yard Center is a matter for arbitration under the N & W conditions. See Part III infra.
 
 
 [45]
 Railway Labor Executives' Ass'n v. United States, supra note 8, 675 F.2d at 1276
 
 
 [46]
 See Brotherhood Complaint, supra note 15, p 15, J.App. 10-11; United Complaint, supra note 17, Sec. IV, J.App. 151-152
 
 
 [47]
 See Brotherhood Complaint, supra note 15, paragraphs 16-17, J.App. 11; United Complaint, supra note 17, Sec. VIII, J.App. 153
 
 
 [48]
 It is well settled that a litigant must present a contention for a ruling at the administrative level before it will be considered by a reviewing court. Blanco Oil Co. v. FERC, 194 U.S.App.D.C. 233, 247 & n. 70, 598 F.2d 152, 166 & n. 70 (1979); Quick v. Martin, 130 U.S.App.D.C. 83, 86, 397 F.2d 644, 647 (1968); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 413, 379 F.2d 453, 467 (1967); California Interstate Tel. Co. v. FCC, 117 U.S.App.D.C. 255, 258-259, 328 F.2d 556, 559-560 (1964)
 
 
 [49]
 The references are to paragraphs 2 and 3 of Article I of the N & W conditions, which provide:
 
 
 [2]
 The rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits (including continuation of pension rights and benefits) of railroads' employees under applicable and/or existing collective bargaining agreements or otherwise shall be preserved unless changed by future collective bargaining agreements or applicable statutes
 
 
 [3]
 Nothing in [these conditions] shall be construed as depriving any employee of any rights or benefits or eliminating any obligations which such employee may have under any existing job security or other protective conditions or arrangements; provided, that there shall be no duplication or pyramiding of benefits to any employees, and, provided further, that the benefits under [these conditions], or any other arrangement, shall be construed to include the conditions, responsibilities, and obligations accompanying such benefits
 N & W conditions, supra note 10, art. I, Secs. 2-3.
 
 
 [50]
 See 49 U.S.C. Sec. 11347 (Supp. III 1985), quoted supra note 42
 
 
 [51]
 See id
 
 
 [52]
 See note 49 supra
 
 
 [53]
 See Brotherhood I, supra note 26, at 3, J.App. 109; Brotherhood II, supra note 26, at 5, J.App. 146
 
 
 [54]
 N & W conditions, supra note 10, art. I, paragraphs 2-3, quoted supra note 49
 
 
 [55]
 Id. art. I, p 9
 
 
 [56]
 Id. art. I, p 12(a)(i), (ii)
 
 
 [57]
 There are exceptions to entitlements for moving expenses and loss-reimbursement. See id. art. I, paragraphs 9, 12(b), 12(c)
 
 
 [58]
 A "displaced" employee is "an employee of the railroads who, as a result of a transaction is placed in a worse position with respect to his compensation and rules governing his working conditions." Id. art. I, p 1(b)
 
 
 [59]
 A "dismissed" employee is "an employee of the railroads who, as a result of a transaction is deprived of employment with the railroads because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as a result of a transaction." Id. art. I, p 1(c)
 
 
 [60]
 Id. art I, paragraphs 5-6
 
 
 [61]
 Id. art. I, p 1(d). However, "[a] dismissed employee entitled to protection ..., may, at his option within 7 days of his dismissal, resign and (in lieu of all other benefits and protections provided in [these conditions] accept a lump sum payment computed in accordance ... with the Washington Job Protection Agreement of May, 1936." Id. art. I, p 7
 
 
 [62]
 Id. art. I p 8
 
 
 [63]
 Railway Labor Executives' Ass'n v. United States, supra note 8, 219 U.S.App.D.C. at 31, 675 F.2d at 1256
 
 
 [64]
 Brotherhood II, supra note 26, at 5, J.App. 146
 
 
 [65]
 N & W conditions, supra note 10, art. I, p 4
 
 
 [66]
 Id
 
 
 [67]
 Id. art. I, p 4(c)
 
 
 [68]
 Id. art. I, p 11
 
 
 [69]
 Id. art. I, p 11(c)
 
 
 [70]
 Notwithstanding any of the foregoing provisions of this section, at the completion of the twenty- (20-) day notice period the railroads may proceed with the transaction, provided that all employees affected (displaced, dismissed, rearranged, et cetera) shall be provided with all of the rights and benefits of [these conditions] from the time they are affected through to the expiration of the seventy-fifth (75th) day following the date of notice of the intended transaction.... If the above proceeding results in displacement, dismissal, rearrangement, et cetera other than as provided by the railroads at the time of the transaction pending the outcome of such proceedings, all employees affected by the transaction during the pendency of such proceedings shall be made whole
 Id. art. I, p 4.
 
 
 [71]
 See Brotherhood I, supra note 26, at 3-4, J.App. 109-110; Brotherhood II, supra note 26, at 5-6, J.App. 146-147
 
 
 [72]
 See Brotherhood I, supra note 26, at 4, J.App. 110; Brotherhood II, supra note 26, at 6, J.App. 147
 
 
 [73]
 See Brotherhood I, supra note 26, at 4, J.App. 110; Brotherhood II, supra note 26, at 5-6, J.App. 146-147
 
 
 [74]
 Brotherhood I, supra note 26, at 5, J.App. 111; Brotherhood II, supra note 26, at 6, J.App. 147
 
 
 [75]
 Two further challenges by the unions deserve attention. First, the Brotherhood contends that the Commission's decision not to request additional evidence from the Brotherhood after it filed its complaint disregarded the Interstate Commerce Act, which prohibits complaint dismissal premised on "the absence of direct damage to the complainants." 49 U.S.C. Sec. 11701(b) (Supp. III 1985). The Brotherhood's argument, in sum, is that if it had been afforded a further opportunity to make a factual showing of the alleged labor violations by the railroads, the Commission might have been disposed to rule differently. We find this contention lacking in merit
 The Commission's conclusion that the unions' complaints were to be measured by the N & W conditions was predicated solely upon the consideration that the activities complained of were directly related to the transaction approved in L & N Trackage Rights, supra note 5. Thus, the existence vel non of employer violations were irrelevant to the Commission's ruling that the N & W's conditions applied and that labor disputes had to be resolved in the manner prescribed by those conditions. The Commission decided a question of law, and no further evidence was necessary or proper.
 The Brotherhood argues additionally that the Commission, by submitting the labor disputes to arbitration in accordance with the N & W conditions, failed to exercise its "primary jurisdiction" in accordance with 49 U.S.C. Sec. 11347 (Supp. III 1985) (requiring the Commission to impose employee-protective conditions). The Brotherhood cites a series of cases in which courts have held that it is for the agency to determine in the first instance whether employee-protective conditions imposed by it have been complied with. See, e.g., Augspurger v. Locomotive Eng'rs, 510 F.2d 853 (8th Cir.1975). See generally Brief for Brotherhood of Locomotive Engineers at 14-15. The primary-jurisdiction doctrine enunciated in these cases serves the limited role of aiding a court in determining whether it or the agency involved is the proper forum for litigating an issue within the agency's area of competence.
 None of the cases relied on by the Brotherhood, however, involved arbitration clauses imposed by an agency with jurisdiction to do so. Where, as here, the conditions to which the Commission subjected the railroads specifically require them to submit to arbitration as a prerequisite to its approval of the transaction proposed, the Commission has in fact exercised jurisdiction. Once a controversy is properly before a tribunal, the doctrine of primary jurisdiction has no bearing on how it rules on substantive issues. Arbitration is a legitimate method of resolving labor disputes and does not divest the Commission of its jurisdiction. Mckeon v. Toledo P. & W. R.R., 595 F.Supp. 766, 769-780 (D.Ill.1984). We thus reject the unions' attempt to expand the scope of the doctrine to a mandate that the Commission adjudicate disputes that it properly determines to be arbitrable.